In the Matter of Sue Ann LAWRANCE,
An Incompetent Adult.

No. 29S04–9106–CV–00460.

Supreme Court of Indiana.

Sept. 16, 1991.

James Bopp, Jr., Mary M. Nimz, Thomas J. Marzen, The National Legal Center For the Medically Dependent & Disabled, Inc., Indianapolis, for appellant.

John L. Egloff, Bryce H. Bennett, Jr., Riley Bennett & Egloff, Indianapolis, for appellees.

C. Alan Funk, West Lafayette, for Association For Retarded Citizens of the U.S., Ethics and Advocacy Task Force of the Nursing Home Action Group, and Medical Issues Task Force of the United Handicapped Federation, amici curiae.

Janice E. Kreuscher, Segal & Macey, Indianapolis, M. Rose Gasner Fenella Rouse, New York City, for Concern For Dying, Inc. and Soc. For the Right To Die, Inc., amici curiae.

Theodore Lockyear, James A. Kornblum, Lockyear & Kornblum, Evansville, Joseph L. Bianculli, Washington, D.C., for The Hillhaven Corp., amicus curiae.

Myra C. Selby, L. Alan Whaley, Terri A. Czajka, Ice Miller Donadio & Ryan, Indianapolis, for Indiana Civ. Liberties Union, amicus curiae.

Paul R. Black, Indianapolis, for Indiana Health Care Ass'n, amicus curiae.

Thomas P. Monaghan, Walter M. Weber, Free Speech Advocates, New Hope, Ky., John J. Potts, School of Law, Valparaiso, Thomas A. Appel, Lansing, Ill., for Indiana Rights to Life, Inc., The Catholic League for Religious and Civil Rights, amici curiae.

C. William Ullrich, Constance J. Dinn, Indiana State Bd. of Health, Indianapolis, Linley E. Pearson, Harry John Watson, Office of Atty. Gen., Indianapolis, for The Indiana State Bd. of Health, amicus curiae.

Ronald L. Dyer, Indiana State Medical Ass'n, Indianapolis, for Indiana State Medical Ass'n, amicus curiae.

Michael V. Gooch, Sharon D. Elvidge, Grace M. Buechlein, Harrison & Moberly, Indianapolis, for The Manor House at Riverview, amicus curiae.

Eric I. Miller, Miller & Waters, Indianapolis, for Donald T. Nelson and Jesse Villalpando, Indiana State Representatives, amici curiae.

Kenneth M. Stroud, Indianapolis, for Kenneth M. Stroud, Professor of Law, Indiana University School of Law–Indianapolis, amicus curiae.

Donna Bays–Beinart, Dutton & Overman, Kenneth C. Kern, Indianapolis, for Unitarian Universalist Fellowship For Social Justice, amicus curiae.

SHEPARD, Chief Justice.

The question is whether the parents of a patient in a persistent vegetative state may authorize the withdrawal of artificially provided nutrition and hydration from their never-competent daughter. We hold that they may.

### Case History

When this litigation began, Sue Ann Lawrance was a forty-two year old woman who was "completely nonverbal, nonambulatory, requir[ing] total care and ... only sustained by artificially delivered nutrition and hydration." Amended Order on Peti-

tion for Authority at 3. She died during the course of this appeal. Sue Ann had been healthy until the age of nine, when she displayed symptoms of intracranial pressure and underwent a craniotomy. She suffered permanent brain damage and attended special schools and camps for the mentally handicapped. From at least 1966 to 1979, Sue Ann suffered balancing problems and seizures which became more frequent over time. In 1987, she fell while attending camp and underwent a second craniotomy. On July 24, 1987, she was admitted to the Manor House nursing home in Noblesville. She remained in a persistent vegetative state from approximately that time until her death.

On March 4, 1991, Sue Ann Lawrance's parents petitioned the Hamilton Superior Court for authority to withdraw their daughter's artificially provided nutrition and hydration. In their amended petition, the parents asked that the court make ten findings, which we condense as follows: (1) that Sue Ann Lawrance has been in a persistent vegetative state since June 1987, that she is never expected to recover, and that continued treatment is futile; (2) that Sue Ann cannot make her own health care decisions and that she has no appointed health care representative; (3) that the

Indiana Health Care Consent Act (HCCA) includes in its definition of "health care" the administration of artificially provided nutrition and hydration; (4) that Sue Ann's mother and father have the authority to withdraw consent for unwanted health care under Indiana Code § 16–8–12–4; (5) that the parents can order the withdrawal of artificially delivered nutrition and hydration for their daughter under an objective "best interests" standard; (6) that the United States and Indiana constitutions guarantee Sue Ann the right to refuse unwanted treatment, including nutrition and hydration; and that Sue Ann's parents can make this refusal on her behalf. March 15 Amended Petition.

The trial court held a hearing on March 26, 1991. The testimony demonstrated that Sue Ann's parents and four siblings all agreed with the decision to withdraw artificial nutrition and hydration. Sue Ann's treating physician, Dr. Thomas Miller, testified at the hearing, and the court received into evidence a letter from Sue Ann's neurologist Dr. Wesley Wong. Both doctors confirmed that the patient was in a persistent vegetative state, that recovery was not expected, and that the doctors supported the family's decision.[1]

---

1. As explained below, we have elected to address three legal issues and thus do not pass on whether the evidence was adequate to support Judge Barr's finding that Sue Ann Lawrance was in a persistent vegetative state as that term is commonly understood in the medical community. The medical evidence before the court was as follows:

Dr. Wong's letter stated: "Based on my neurological evaluation, I believe that Sue Ann is, unfortunately, residing in a chronic vegetative state. This is supported by her clinical picture and her lack of improvement over the last 3½ years. She has remained in a chronic vegetative state since her acute brain injury consisting of a subdural hematoma.... I believe that Sue Ann's prognosis for a full return of recovery, neurologically, to a full functional state is essentially nil. Unfortunately, she has not made any improvement neurologically, and I do not expect her to improve in the future." Record at 272.

Dr. Miller testified that "[since July 1987,] I have never seen her make a communicative effort, such as speaking. I have never seen her make a purposeless, purposeful movement. I have only see[n] her make a movement in response to pain. I have gone in, talked to her

verbally, tried to get her to respond and I have never seen her squeeze my hand, move. The only thing I can ever obtain from her is movement to pain." Id. at 255–56. He then testified that Sue Ann, in his opinion, was "in a persistent vegetative state," and that "[i]n my opinion from talking to Dr. Wong, Dr. Turner, the studies that have been performed, I'd say there is no hope [of "her likelihood of ever regaining consciousness, human consciousness, a consciousness above a persistent vegetative state."]" Id. at 256.

Dr. Miller relied in part in his evaluation on his consultation with Dr. Michael Turner, Sue Ann's neurosurgeon. A March 15, 1991, letter from Dr. Turner admitted into evidence stated that, although he had not examined Sue Ann in over three years, he could conclude that he would "strongly favor withdrawal of all treatment from Sue Ann if she is in a persistent vegetative state and has remained so for the 3½ years since her acute subdural hematoma. I would expect no further improvement from her head injury after 24 months. Therefore, the state she is in surely could be considered persistent and permanent without hope for further recovery." Id. at 239.

Manor House, though not a party, participated at the hearing. Counsel for the nursing home cross-examined each of the family's witnesses and also presented her own witnesses. Diane Huestis, the home's administrator, testified that Manor House was taking no position on the parents' petition, and that the home would comply with the decision of the court. Throughout the proceeding, however, Manor House made clear its concern that the home remained subject to state and federal regulation and sanction regardless of the decision of Sue Ann's family and doctors.

Judge Jerry Barr entered his order on May 2, 1991, and made minor amendments on May 8 and May 16, 1991. He held in relevant part: (1) that Sue Ann was in a persistent vegetative state; (2) that Sue Ann's parents had authority under the HCCA "to consent, as surrogate decision-makers, to the withdrawal of artificially delivered nutrition and hydration from their daughter ... who would otherwise remain indefinitely in a persistent vegetative state"; (3) that "the liberty interest of the individual, as set forth in Article I, Sec. 1 of the Indiana Constitution, does include the right of Sue Ann Lawrance to be free from unwanted medical treatment and that said Article further requires the State to give effect to the decision of Sue Ann's surrogate decision makers"; (4) that the Indiana State Board of Health has no further jurisdiction regarding Sue Ann's nutrition and hydration, and that they should not interfere with the decisions of Sue Ann's surrogate decisionmakers and doctors; (5) that Manor House "or any successor nursing home facility, any hospital, or any health care provider" should not interfere with the treatment plans of the surrogate decisionmakers, and that they should permit withdrawal of "all or part of any artificial nutrition and hydration of Sue Ann Lawrance as her physicians and surrogate decision makers shall direct."

Some time after May 2, 1991, the family moved Sue Ann from the nursing home in Hamilton County to St. Vincent's Hospice in Marion County. A group called The Christian Fellowship with the Disabled then petitioned for her guardianship in the probate division of the Marion Superior Court. On May 16, 1991, Judge Charles J. Deiter held a hearing at which the Fellowship, Sue Ann's parents, Manor House, St. Vincent's, and others were present. Judge Deiter appointed a guardian ad litem to represent Sue Ann for purposes of that hearing. The court granted the Fellowship's petition and appointed its attorney Patti Mullins as Sue Ann's temporary limited guardian. Mullins' authority was limited to seeking a stay or other relief from the judgment of the Hamilton Superior Court and seeking appellate review of the judgment of the Hamilton Superior Court.

On May 17, 1991, Mullins requested a stay of the Hamilton County order from Judge Barr. At a hearing on May 18, 1991, the parents agreed to stay withdrawal of nutrition and hydration for twenty-one days. In light of this agreement, the court stayed its order for twenty-one days.

On May 23, 1991, Mullins resigned as temporary limited guardian. Judge Deiter appointed Daniel Avila as successor temporary limited guardian. Avila is an attorney with the National Legal Center for the Medically Disabled and Dependent. On May 30, Avila moved to be joined as an additional party in the Hamilton case. Judge Barr denied the motion the same day. On June 3, Avila moved Judge Barr to stay his order pending appeal; Judge Barr denied this motion on June 5.

Avila as appellant next filed a motion in the Court of Appeals on June 6 asking for a stay pending appeal. The Court of Appeals heard argument concerning that request on June 7 and granted a stay providing a record of the proceedings was filed by June 14, 1991, at 4:30 p.m. The record was timely filed on June 14. This Court then granted the parent-appellees' "Verified Petition for Transfer to the Supreme Court," which they had filed on June 5.

Both sides raise a number of issues on appeal. These issues generally touch on three questions: whether the temporary limited guardian has standing to bring this appeal; whether Judge Barr erred in denying Avila's motion to be joined as a party;

and whether Judge Barr erred in holding that the Health Care Consent Act authorized the Lawrances as surrogate decisionmakers to withdraw Sue Ann's nutrition and hydration.

On July 18, 1991, Sue Ann Lawrance died of natural causes. Both sides to this litigation have expressed their desire to proceed with the case despite her death.

### The Question of Mootness

The long-standing rule in Indiana courts has been that a case is deemed moot when no effective relief can be rendered to the parties before the court. When the concrete controversy at issue in a case "has been ended or settled, or in some manner disposed of, so as to render it unnecessary to decide the question involved," the case will be dismissed. *Dunn v. State* (1904), 163 Ind. 317, 321, 71 N.E. 890, 894. The death of Sue Ann Lawrance means this Court can no longer provide the requested relief to the parties. We therefore address first whether this case should be dismissed as moot.

 While Article III of the United States Constitution limits the jurisdiction of federal courts to actual cases and controversies, the Indiana Constitution does not contain any similar restraint. Thus, although moot cases are usually dismissed, Indiana courts have long recognized that a case may be decided on its merits under an exception to the general rule when the case involves questions of "great public interest." *See, e.g., Indiana Educ. Employment Relations Bd. v. Mill Creek Classroom Teachers Ass'n* (1983), Ind., 456 N.E.2d 709, 711–12; *State ex rel. Smitherman v. Davis* (1958), 238 Ind. 563, 151 N.E.2d 495; *State ex rel. Gregory v. Boyd*

(1909), 172 Ind. 196, 87 N.E. 140. Cases found to fall within the public interest exception typically contain issues likely to recur.[2] *See, e.g., Mill Creek Teachers Ass'n*, 456 N.E.2d at 712; *Smitherman*, 238 Ind. at 568, 151 N.E.2d at 497. The instant case falls within this exception to our general rule. The public interest at stake is demonstrated in part by the great number of high quality amicus briefs submitted to this Court. These briefs suggest that, irrespective of the death of the patient in this litigation, many Indiana citizens, health care professionals, and health care institutions expect to face the same legal questions in the future. We are also persuaded to proceed because of the high caliber of the findings and analysis in Judge Barr's orders. In light of Sue Ann Lawrance's death, however, this Court no longer need address all of the issues in the case as presented by the parties. *Cf. City of Jeffersonville v. Louisville & Jeffersonville Bridge Co.* (1908), 169 Ind. 645, 656, 83 N.E. 337, 340 (when public questions remain at issue in case otherwise disposed of, Court may select "the essential questions in the case, so far as the record may be said to present them").

### Issues

We have elected to address the following issues in this case:

I. Whether the Model Health Care Consent Act (HCCA), Ind. Code §§ 16–8–12–1 to –12 (West Supp.1990), applies when the family of a never-competent patient in a persistent vegetative state seeks to withdraw the patient's artificially provided nutrition and hydration.

II. Whether court proceedings are required to effectuate the will of decision-

---

2. The Court of Appeals has declared that an additional element is required to resolve a moot case on its merits: that the case must be likely to evade review. *Bartholomew County Hosp. v. Ryan* (1982), Ind.App., 440 N.E.2d 754, 759 (citing *Krochta v. State* (1978), Ind.App., 372 N.E.2d 475). This holding is premised on a misreading of *Krochta*, which nowhere includes "evading review" as a requirement of deciding otherwise moot cases. "Capable of repetition, yet evading review" is a federal mootness doctrine, stricter than our own, rooted in the requirement that

Article III courts decide only live cases and controversies. *See, e.g., United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 395–401, 100 S.Ct. 1202, 1208–1211, 63 L.Ed.2d 479 (1980) (describing mootness' basis in Article III); *DeFunis v. Odegaard*, 416 U.S. 312, 316, 94 S.Ct. 1704, 1705–06, 40 L.Ed.2d 164 (1974) (per curiam) (case decided by state court under "great public interest" exception to mootness rule still subject to threshold federal mootness analysis when appealed to federal court).

makers if the Health Care Consent Act does apply to such nutrition and hydration decisions.

III. Whether the Marion Superior Court erred in appointing a temporary limited guardian for Sue Ann Lawrance.

### I. Does the Health Care Consent Act Apply?

Judge Barr found that Sue Ann's parents had authority to withdraw Sue Ann's nutrition and hydration under Indiana Code § 16–8–12–4, part of Indiana's Health Care Consent Act. The first step in assessing the validity of the trial court's order must therefore be determining whether the HCCA properly applies to decisions to withdraw artificially provided nutrition and hydration.

The HCCA applies to "health care" decisions. As defined in the act, " '[h]ealth care' means any care, treatment, service, or procedure to maintain, diagnose, or treat an individual's physical or mental condition. The term includes admission to a health care facility." Ind.Code § 16–8–12–1(2). This definition does not expressly include or exclude artificial nutrition and hydration decisions from the HCCA.

Appellant contends that the HCCA does not apply to the Lawrances' decision. He relies on Indiana Code § 16–8–12–11 which provides: "This chapter does not *affect* Indiana law concerning an individual's authorization to make a health care decision for the individual or another individual, or to provide, withdraw, or withhold medical care necessary to prolong or sustain life." Ind.Code § 16–8–12–11(a) (emphasis added).

Our objective in statutory construction is to determine and effect the intent of the legislature. *Thompson v. Thompson* (1972), 259 Ind. 266, 286 N.E.2d 657. We examine a statute as a whole, giving common and ordinary meaning to the words used. *Foremost Life Ins. v. Department of Ins.* (1980), 274 Ind. 181, 409 N.E.2d 1092.

We take the use of the word "affect" in § 16–8–12–11(a) to indicate the legislature's intent that the HCCA be a procedural statute. The comments to the uniform act on which the HCCA is based indicate that this is its purpose. *See Unif. Law Commissioners' Model Health–Care Consent Act,* 9 U.L.A. part 1, 453 (1988) [hereinafter *Model Act*] (prefatory note) ("This Act is procedural in nature and is purposefully narrow in scope."); *id.* at § 11, 472 (comment) ("Nothing in this Act changes existing law [regarding termination of treatment]."); *Eads v. J & J Sales* (1971), 257 Ind. 485, 491, 275 N.E.2d 802, 806 (permissible "to consider the notes of the Commissioners of Uniform Laws when construing a uniform statute"); Brief of Amicus Curiae Indiana Civil Liberties Union at 23 n. 7.

The HCCA was hardly enacted in a legal vacuum. In recognition of existing law, the act is designed to establish procedures for health care decision making without altering the substantive rights of patients and their families. In this sense, the HCCA does not "affect" substantive Indiana law on withdrawal of treatment. We cannot accept appellant's reading of Indiana Code § 16–8–12–11(a) that the HCCA does not *apply* to decisions about nutrition and hydration.

Regarding the HCCA as procedural, we are led to examine the substantive laws of the state, that is, the legal landscape in which the act was written. The HCCA was written in a culture in which families typically make health care decisions when patients cannot. Indiana common law and statutory law both describe an environment in which patient decision making is a central tenet.

Indiana's common law doctrine of informed consent recognizes the right of the patient "to intelligently reject or accept treatment." *Revord v. Russell* (1980), Ind. App., 401 N.E.2d 763, 767. Perhaps the strongest explanation of the basis for this rule is contained in *Payne v. Marion General Hospital* (1990), Ind.App., 549 N.E.2d 1043, 1046, *trans. denied*: "The patient's right of self-determination is the *sine qua non* of the physician's duty to obtain informed consent. As Justice (then Judge) Cardozo said: 'Every human being of adult

years and sound mind has a right to determine what shall be done with his own body....' *Schloendorff v. Society of New York Hospital* (1914), 211 N.Y. 125, 129, 105 N.E. 92, 93."

This common law has evolved in a legal culture governed by the Indiana Constitution, which begins by declaring that the liberty of our citizens is inalienable. Ind. Const. art. I, § 1. The debates of our constitutional convention suggest that those who wrote the constitution believed that liberty included the opportunity to manage one's own life except in those areas yielded up to the body politic.[3]

Like the common law and our constitution, Indiana's statutes reflect a commitment to patient self-determination. The Living Will Act, though inapplicable to the case at bar, declares that "[c]ompetent adults have the right to control the decisions relating to their own medical care, including the decision to have medical or surgical means or procedures calculated to prolong their lives provided, withheld, or withdrawn." Ind.Code § 16–8–11–1 (West Supp.1990). The new Powers of Attorney Act, by allowing patients to designate individuals to consent to or refuse their own health care, also demonstrates respect for patient autonomy. Ind.Code § 30–5–5–16(b)(2) (Burns Supp.1991). This policy is also evident in the HCCA, which allows patients to select individuals to consent to their health care. Ind.Code § 16–8–12–6; Ind.Code § 16–8–12–8; *Model Act*, 9 U.L.A. part 1 § 6, 465 (comment) ("The decision to allow the transfer of authority rests on the principle of the basic human need of self determination and individual autonomy.").

Respect for patient autonomy does not end when the patient becomes incompetent. In our society, health care decision making for patients typically transfers upon incompetence to the patient's family. "Our common human experience informs us that family members are generally most concerned with the welfare of a patient. It is they who provide for the patient's comfort, care, and best interests, and they who treat the patient as a person, rather than a symbol of a cause." *In re Jobes*, 108 N.J. 394, 416, 529 A.2d 434, 445 (1987) (citations omitted). Even when they have not left formal advance directives or expressed particular opinions about life-sustaining medical treatment, most Americans want the decisions about their care, upon their incapacity, to be made for them by family and physician, rather than by strangers or by government. This preference is reflected in the HCCA's default provision, which says the patient's close family may make health care decisions when no other health care representative or guardian has been designated for the patient. Ind.Code § 16–8–12–4. This right to consent to the patient's course of treatment necessarily includes the right to refuse a course of treatment.

Determining the existence of a substantive right of a patient or her representative to refuse life-sustaining medical treatment does not dispose of the issue at hand. Only if artificially provided nutrition and hydration falls within the definition of such treatment do the procedures of the HCCA properly apply to the Lawrances' petition.

We conclude that the administration of artificial nutrition and hydration (most people call it "tube-feeding") is medical treatment which can be refused. Three sources inform our understanding: the view of the Indiana medical community; Indiana statutory law, including the HCCA; and persuasive authority from numerous courts across the country.

We often rely on the medical community for accepted definitions of concepts commonly applied in that discipline. On this subject, the Indiana State Medical Associa-

---

**3.** Delegate Thomas Smith declared that article I, section 1, constituted a recognition that God had given to all persons equally complete sovereignty over their affairs, including the simplest such as the pursuit of happiness and "the right to walk abroad and look upon the brightness of the sun at noon-day[.]" 1 *Debates in Indiana Convention* 968 (1850). Delegate John B. Howe asserted that when people create governments, they do not create restrictions upon their natural rights but merely delegate a portion of them to government for so long as they deem it expedient. *Id.* at 960.

tion, a state affiliate of the American Medical Association (AMA), explains:

> The clear weight of medical opinion recognizes that artificially provided nutrition and hydration constitute medical treatment. For example, the AMA's Ethical Opinion 2.20 ... expressly defines the artificial provision of nutrition and hydration as medical treatment that may be withdrawn from a person in a persistent vegetative state. The AMA's position is consistent with other prominent organizations and commissions, including the President's Commission for the Study of Ethical Problems in Medicine and Behavioral Research, the Hastings Center, and the American Academy of Neurology.

Brief of Amicus Curiae Indiana State Medical Ass'n at 9; *see also* AMA Council on Ethical and Judicial Affairs, *Current Opinions* 13 (1989).

The very broad scope which the legislature gave the HCCA also persuades us that its procedures may be applied to decisions concerning artificial nutrition and hydration (even if the act itself did not affect existing substantive authority).[4] The HCCA defines health care as "any care, treatment, service, or procedure...." Ind. Code § 16–8–12–1(2). The legislature did not even limit the term "treatment" to "medical treatment." Read through the lens of the medical community's view, even a limitation to "medical treatment" would include nutrition and hydration decisions. We conclude that artificial nutrition and hydration is health care within § 16–8–12–1(2).[5]

This conclusion is consistent with the apparently widespread view of courts that "there is no objective distinction between withdrawal or withholding of artificial feeding and any other medical treatment." *In re Peter*, 108 N.J. 365, 382, 529 A.2d 419, 428 (1987) (footnote omitted). *See, e.g., In re Conroy*, 98 N.J. 321, 372–73, 486 A.2d 1209, 1236 (1985) ("Once one enters the realm of complex, high-technology medical care, it is hard to shed the 'emotional symbolism' of food. However, artificial feedings such as nasogastric tubes, gastrostomies, and intravenous infusions are significantly different from bottle-feeding or spoonfeeding....") (citation omitted); *Gray v. Romeo*, 697 F.Supp. 580, 587 (D.R.I.1988); *Drabick v. Drabick*, 200 Cal. App.3d 185, 195, 245 Cal.Rptr. 840, 846 n. 9 (Cal.Ct.App.1988), *cert. denied*, 488 U.S. 958, 109 S.Ct. 399, 102 L.Ed.2d 387 (citing numerous courts in agreement).

We recognize that categorizing artificial nutrition and hydration as medical treatment does not necessarily mean that many citizens would consider such procedures to be the same as, say, invasive surgery. Some family members who would refuse permission for extraordinary surgery

---

**4.** Just as the act does not affect existing substantive law on health care decisions, it also declares that nothing in the act "may be construed to authorize euthanasia." Ind.Code § 16–8–12–12. We take euthanasia to be "the termination of another's life by act or omission, with the specific intention to do so, in order to eliminate suffering." *Brophy v. New England Sinai Hosp.*, 398 Mass. 417, 450, 497 N.E.2d 626, 644 (1986); *accord* Hyland & Brame, *In re Quinlan: A Synthesis of Law and Medical Technology*, 8 Rut.–Cam.L.J. 37, 52 (1976) (euthanasia "the deliberate easing into death of a patient suffering from a painful and fatal disease"). Insofar as euthanasia is intended to relieve the suffering of a dying patient, it is not a concept applicable to patients in a persistent vegetative state. The meaning of this section for patients who are not in such a state is difficult to assess in light of recent amendments to our Power of Attorney Act.

**5.** This interpretation is supported by both the living will and powers of attorney statutes. The Powers of Attorney Act includes in its definition of health care "the providing of nutrition and hydration through intravenous, endotracheal [sic], or nasogastric tubes." Ind.Code § 30–5–2–4 (Burns Supp.1991). This act is then incorporated by reference into the HCCA to the extent that it does not conflict with the HCCA. Ind. Code § 16–8–12–13 (Burns Supp.1991). The incorporation supports the notion that health care, as defined broadly in the HCCA, includes the administration of artificial nutrition and hydration. In contrast, the 1985 Living Will Act expressly excludes "the provision of appropriate nutrition and hydration" from its internal definition of life-prolonging procedures. Ind.Code § 16–8–11–4 (West Supp.1990). Enacted two years later, the HCCA contained no such exclusion, suggesting that the legislature never intended to exclude artificial nutrition and hydration from the HCCA's definition of health care.

might feel compelled to continue tube-feeding. Still, artificial nutrition and hydration can be successfully provided only by trained professionals working in a controlled environment.[6]

In sum, we conclude that artificial nutrition and hydration is treatment that a competent patient can accept or refuse, that the family of an incompetent patient can accept or refuse it on behalf of the patient, and that the procedures of the HCCA apply to such decisions.

## II. Is a Court Proceeding Necessary?

Having determined that the withdrawal of artificial nutrition and hydration is a health care decision within the scope of the HCCA, we turn now to Judge Barr's findings. We read the Lawrances' amended petition as a request for declaratory relief only. The family sought assurance that the decision to withdraw artificial nutrition and hydration fell within the scope of the HCCA, and that they could order such withdrawal, as Sue Ann's parents, under Indiana Code § 16–8–12–4. In ruling on the petition, however, the trial court issued both declaratory and injunctive relief. The court enjoined the State Board of Health, Manor House, successor nursing homes, hospitals, and health care providers, none of which were parties to the action.

▆ The HCCA, written for a society in which health care decisions are routinely made by families on advice of physicians, is designed to resolve health care decisions without a need for court proceedings. Thus, in § 16–8–12–4, the legislature establishes the desired priority for substitute decisionmakers.[7] *See Model Act,* 9 U.L.A. part 1 § 4, 462 (comment). In the case at bar, Sue Ann Lawrance was (1) incapable of consenting to her own health care, Ind. Code § 16–8–12–4(a); (2) had not appointed a health care representative herself under § 16–8–12–6, Ind.Code § 16–8–12–4(a); (3) had no guardian or appointed health care representative under § 16–8–12–7, Ind. Code § 16–8–12–4(a)(2)(A); and (4) had not disqualified her parents as decision makers under § 16–8–12–8, Ind.Code § 16–8–12–4(a)(2). In short, all of the conditions of Indiana Code § 16–8–12–4(a)(2) were met for a "spouse, parent, adult child, or adult sibling" to make a health care decision for Sue Ann Lawrance under the provisions of Indiana Code § 16–8–12–4. The HCCA mandates that such authorized decisionmakers "shall act in good faith and in the best interest of the individual incapable of consenting." Ind.Code § 16–8–12–4(d). Court proceedings were *not* required for the Lawrances to make health care decisions for their daughter.

▆ Given the legislature's design that the HCCA operate without court intervention in instances where none of the interested participants disagree, we think that any future declaratory proceedings under § 16–8–12–4 would be inappropriate.[8]

6. The record suggests that such feeding is not for the layman to administer. Sue Ann's feeding was described by her doctor in the Hamilton court proceedings as "three-fourths strength, 45 cc.'s per hour." Record at 286.

7. Indiana Code § 16–8–12–4 provides in part:

(a) If an individual incapable of consenting under section 3 of this chapter has not appointed a health care representative under section 6 of this chapter or the health care representative appointed under section 6 of this chapter is not reasonably available or declines to act, consent to health care may be given:
(1) by a judicially appointed guardian of the person or a representative appointed under section 7 of this chapter;
(2) by a spouse, parent, adult child, or adult sibling unless disqualified under section 8 of this chapter, if:

(A) there is no guardian or other representative described in subdivision (1);
(B) the guardian or other representative is not reasonably available or declines to act; or
(C) the existence of the guardian or other representative is unknown to the health care provider....

8. Counsel for the Lawrances said during oral argument that this litigation commenced in part because his clients were uncertain about the state of the law and about their own authority. Even if there might be some unusual circumstance warranting a future declaratory proceeding, issuing injunctive relief in such litigation, as the Hamilton Superior Court did, would be improper. Moreover, Indiana Code § 16–8–12–4 merely recognizes the traditional and very private role which American families play in health care decisions. The existence of the statute does not convert family decisions into state

Decisions concerning withdrawal of treatment are not necessarily better decided by the courts. It would be hubris to think otherwise.

Our desire to leave future health care decisions to patients, their families, and their physicians comports not only with the will of the General Assembly, but also with the decisions of other courts who have reached the same conclusion. *See, e.g., In re Jobes*, 108 N.J. at 428, 529 A.2d at 451 ("Courts are not the proper place to resolve the agonizing personal problems that underlie these cases. Our legal system cannot replace the more intimate struggle that must be borne by the patient, those caring for the patient, and those who care about the patient."); *Drabick v. Drabick*, 200 Cal.App.3d at 198, 245 Cal.Rptr. at 847 ("[C]ourts do not have a general commission to supervise medical treatment decisions. Patients make their own treatment decisions with the advice of their physicians. Family members, and sometimes other persons, participate when the patients cannot. Courts, on the other hand, become involved only when no one is available to make decisions for a patient or when there are disagreements.").

Permitting most medical decisions to be made without court intervention does not irresponsibly place helpless patients in a position of unusual risk. Families called upon to act without coming to court do not operate without restraint. Neither health care providers nor families of patients are given unbridled discretion in treatment decisions. Numerous other safeguards serve to constrain health care decision making.

We expect the first line of defense against abuses in withdrawal of treatment to be the ethical guidelines of the medical profession. Advances by medical ethics committees and ethics opinions issued by groups like the AMA keep pace with rapid progress in the field of medical technology; we perceive that medical ethics committees grow stronger every year and that ethics opinions grow increasingly sophisticated.

"[E]thics lies in the realm of practice as opposed to theory. That's well established from the time of Aristotle. And I think that's what we're talking about here. What does it mean to practice good medicine?" Record at 315 (testimony of Dr. Greg Gramelspacher, medical ethicist). The history of respect for decisions of ethics committees in the withdrawal of treatment field, where reliance on court decisions would be unduly burdensome, has its origins as early as the first well known case in this area. *See In re Quinlan*, 70 N.J. 10, 355 A.2d 647 (1976).

Health care providers involved in withdrawal of treatment decisions are also likely to act very conservatively in light of the external constraints on their professional conduct. Appellant, along with amici curiae Manor House at Riverview, the Indiana Health Care Association, and the Indiana State Board of Health, ably point out numerous state and federal regulations governing the health care profession. For example, Indiana Code §§ 16–10–4–1 to –27 (West 1991) establishes rules for the licensing of health facilities; Indiana Code §§ 16–10–4.1–1 to –4 (West Supp.1990) requires compliance with federal medicaid regulations; and Indiana Administrative Code title 410, article 16.2 (1988 and Supp. 1991) establishes licensing and operational standards for health facilities. Additionally, Indiana Code § 35–46–1–4 (West 1986) establishes the neglect of a dependent as a felony; Indiana Code §§ 4–28–5–1 to –13 (West 1991) creates an adult protective services unit; and Indiana Code § 31–6–11–10 (West Supp.1990) establishes a local child protection service by county.

These constraints are hardly hypothetical, but they do attempt to sort out abuses from reasonable behavior. *See Hall v. State* (1986), Ind., 493 N.E.2d 433 (affirming reckless homicide conviction of parents who withheld medical treatment from son); *Barber v. Superior Court*, 147 Cal.App.3d 1006, 195 Cal.Rptr. 484 (1983) (dismissing indictment against physician); Altman,

---

action within the meaning of the fourteenth amendment to the U.S. Constitution, and thus the due process clause does not apply to them.

A proceeding for equitable relief under § 16–8–12–7, of course, does call upon the court to exercise the authority of the state.

*Jury Declines to Indict Doctor Who Said He Aided in a Suicide*, N.Y. Times, July 27, 1991, § 1, at 1, col. 2.

The existence of this great variety of safeguards does not leave patients or their representatives who refuse treatment including artificial nutrition and hydration unprotected from collateral consequences. The HCCA contains extensive immunity provisions for health care providers relying on decisionmakers whom they "believe in good faith" are authorized to consent to health care. Ind.Code § 16–8–12–9(a). This same code section seems to protect the decisionmakers as well. Ind.Code § 16–8–12–9(c). Numerous briefs submitted to this Court, however, highlight the great number of other constraints operating on health care providers. We expect that these constraints will serve to prevent hasty or inappropriate treatment decisions.

 We expect, for example, that in cases like the one at bar, in which the patient's physicians and family members unanimously agree to a course of action, the good faith requirement of the HCCA, Ind.Code § 16–8–12–9, will be met, and complete immunity will follow. In keeping with the design of an HCCA that usually works independently of the courts, this result, where appropriate, will attach despite the lack of a court proceeding.

When a patient's health care provider or some family member disagrees with the course of action preferred by the patient's parents or other health care decisionmaker, Indiana Code § 16–8–12–7 provides a mechanism for challenges, regardless of whether the initial decision involves court action. Court action under this section is appropriate where an "individual authorized to consent to health care is not reasonably available, declines to act, or is not acting in the best interest of the individual in need of health care." Ind.Code § 16–8–12–7(d)(3). The commentary of the uniform act from which Indiana adapted the HCCA indicates that resolving disputes is the very purpose

of this section. *Model Act*, 9 U.L.A. part 1 § 4, p. 462 (comment) (suggesting objections to decisions be considered under section 7).

 Because the Lawrances were authorized to act and apparently willing to do so and because the physicians and family agreed with their decision, there was no basis for a proceeding under § 16–8–12–7.[9] Indeed, under these sorts of circumstances, there should be no withdrawal of treatment cases before an Indiana court under § 16–8–12–4 either.

### III. Did the Probate Court Err in Appointing a Guardian?

 The Marion Superior Court appointed a temporary limited guardian for Sue Ann Lawrance under Indiana Code § 29–3–3–4 (West Supp.1990), an emergency appointment provision of the code's article on guardianship. The Lawrances appeal this as a cross error, in accordance with Ind. Trial Rule 59(G).

At least four statutory requirements must be met before a court can make such an appointment. The trial court must find that:

(1) a guardian has not been appointed for an incapacitated person or minor;

(2) an emergency exists;

(3) the welfare of the incapacitated person or minor requires immediate action; and

(4) no other person appears to have authority to act in the circumstances....

Ind.Code § 29–3–3–4(a)(1) to –4(a)(4).

In appointing Patti Mullins as temporary limited guardian, Judge Deiter found that all four conditions were met. At least with respect to the fourth condition, this finding was clearly erroneous. Because the HCCA applied to the decision about whether to remove Sue Ann's gastric tube, Sue Ann's family clearly "appear[ed] to have authority to act in the circumstances" under Judge Barr's order. Ind.Code § 29–3–3–4(a)(4).

---

9. We presume that in disputed cases under § 16–8–12–7, the appointment of a guardian ad litem would be necessary. Given the serious and deeply personal nature of such proceedings,

it would be particularly important to appoint a guardian ad litem who would pursue the interest of the patient alone and do so without ideological prediliction.

Furthermore, the fourth requirement of the emergency guardianship statute would have failed in this case even without the Hamilton court proceedings. Acting without court intervention under HCCA § 16-8-12-4(a)(2), the Lawrance family as Sue Ann's "spouse, parent[s], adult child, or adult sibling[s]," still would have had the requisite authority to act for the purposes of § 29-3-3-4(a)(4). Because we expect that a collateral attack of an HCCA decision under the emergency guardianship statute should always fail to meet § 29-3-3-4(a)(4), we have no occasion to consider whether any of the other three conditions were satisfied in the case at bar. The appointment of Patti Mullins as temporary limited guardian, and her replacement by Daniel Avila, were invalid.

Although the emergency guardianship statute cannot be used to challenge an HCCA decision collaterally, Indiana Code § 16-8-12-7 does provide a mechanism for challenging health care decisions. That Indiana Code § 16-8-12-7 could have been used to challenge the Lawrances' decision, however, does not mean that Mr. Avila could have successfully petitioned the Marion Superior Court had he properly used the HCCA instead of the emergency guardianship statute. Two factors suggest that such a petition by Mullins or Avila would not have been entertained.

First, the HCCA requires such petitioners be "a health care provider or any interested individual." Ind.Code § 16-8-12-7(a). There is no evidence that Mullins or Avila were providing health care to Sue Ann Lawrance, or were interested individuals, or that they even knew her. They were "interested" in her only in the generic sense that any person who makes the effort to go to court is interested. If the General Assembly intended to permit strangers to litigate family decisions, it could have said a challenge may be mounted by "any individual." The use of the word "interested" suggests that strangers need not apply.[10]

Second, a challenging petition under § 16-8-12-7 must be made to "the court having jurisdiction under IC 29-3-2 in the county where the individual is present for purposes of receiving health care." Ind.Code § 16-8-12-7(a). The relevant venue requirement can be found at Indiana Code § 29-3-2-2 (West Supp.1990). Even if we assume that the patient had moved to Marion County at the time of the Marion County proceeding, the code dictates that "[i]f proceedings are commenced in more than one (1) county, they shall be stayed except in the county where first commenced until final determination of the proper venue by the court in the county where first commenced." Ind.Code § 29-3-2-2(b). Because proceedings had already begun in Hamilton County, any proceedings in Marion County should have been stayed until Judge Barr determined whether transfer of the case to Marion County was proper under Indiana Code § 29-3-2-2(c).

### Conclusion

The law of our state permits families to decide, in consultation with their physicians, that tube-feeding of a loved one in a persistent vegetative state should be ended. Our law permits them to make these decisions without coming to court. When there is not unanimity amongst those with tangible professional or personal interest in the patient, the courts are available to resolve the dispute if need be.

GIVAN, DICKSON and KRAHULIK, JJ., concur.

DeBRULER, J., concurs and dissents with separate opinion.

DeBRULER, Justice, concurring and dissenting.

Because the death of Sue Ann Lawrance has rendered the issues in this appeal moot, it should be dismissed. An appeal becomes moot and should be dismissed when the

---

**10.** The proper recourse for a challenger like Avila denied standing by a trial court under Indiana Code § 16-8-12-7 on the grounds of lack of interest would be the ordinary appellate process. That is, the appellate procedure would be the same as it would be if the petitioner were found to be interested but his requested relief refused.

controversy or dispute originally existing at the time of the commencement of the action ceases to be a concrete one requiring settlement, loses its essential character, is no longer live, or the court on appeal is unable to render effective relief. *State ex rel. Gregory v. Boyd* (1909), 172 Ind. 196, 87 N.E. 140; *Bartholomew County Hosp. v. Ryan* (1982), Ind.App., 440 N.E.2d 754. As pointed out in the majority opinion, a moot appeal may nevertheless be maintained and decided if it falls within the exception for questions of great public importance. *Bartholomew County Hospital v. Ryan,* 440 N.E.2d at 759; *In re Marriage of Stariha* (1987), Ind.App., 509 N.E.2d 1117, 1123. The case of *State v. Davis* (1958), 238 Ind. 563, 151 N.E.2d 495, involved such an appeal. There the trial court refused to order school children transferred from one school to another for the school year 1955–1956. On appeal by the parents this Court noted that the school year 1955–1956 had long since passed and that the specific question was moot, but decided the case on its merits under the exception because "the same question reoccurs year after year as to the appellants and the parents of other children throughout the state...." *Id.* 151 N.E.2d at 497. This statement supports and exemplifies the repeated holding of the Court of Appeals that the public interest exception requires the elements of (1) likely reoccurrence, and (2) a context which will continue to evade review. *Bartholomew County Hosp. v. Ryan.* The need of parents to transfer their children was a reoccurring one and the context of it would be a time so short as to render appellate review unavailable.

Persons like Sue Ann Lawrance who reach a persistent unconscious state while being provided with only food and fluid can be expected to live for long periods of time. This is the position of the American Academy of Neurology. *Position of the American Academy of Neurology on Certain Aspects of the Care and Management of the Persistent Vegetative State Patient,* 39 Neurology 125, 125–26 (1989). Therefore, there is no reason to believe that such persons will die before court judgments defining their proper treatment can be fully considered on appeal. Such appeals will not evade review. Furthermore, I am not satisfied that this is a case likely to reoccur. There cannot be many persons who, like Sue Ann Lawrance, are non-terminal, being maintained in a persistent vegetative state on food and water, and have never been competent during their lifetimes to make medical treatment decisions. It is a special and unusual case. Because this appeal is moot and does not fall within an exception it should be dismissed.

The majority of the Court has ruled that this appeal falls within an exception to the mootness rule and proceeds to address several important issues. Because of this ruling and the fact that the majority opinion sets the course for the law in this class of cases, I deem myself obligated to render my own view on several issues. With respect to the proper construction of the Health Care Consent Act, I.C. 16–8–12–1, et seq., I find a single form of court jurisdiction recognized in it and that form is probate jurisdiction. Probate jurisdiction is to be exercised by courts in accordance with I.C. 16–8–12–7. I read the amended petition of the Lawrance parents as one seeking court approval of a particular health care decision, which could only be appropriate under section 7. Because section 7 was not complied with by giving notice to the person alleged to be incapable of consenting, Sue Ann Lawrance, an incompetent person, as required by due process, the judgment should be reversed. *Covey v. Town of Somers,* 351 U.S. 141, 76 S.Ct. 724, 100 L.Ed. 1021 (1956). If the statute did not have this requirement of notice, Article 1, Section 12 of the Indiana Constitution would impose it. *See Mueller v. Mueller* (1972), 259 Ind. 366, 287 N.E.2d 886. As Justice Frankfurter wrote, "The history of liberty has largely been the history of observance of procedural safeguards." *McNabb v. United States,* 318 U.S. 332, 347, 63 S.Ct. 608, 616, 87 L.Ed. 819, 827–28 (1943).

The purpose of this Act is to facilitate the delivery of "health care" by "health care provider[s]" to individuals who are

"incapable of consenting." Some facilitation is needed because the delivery of health care is impeded where the civil law requires informed consent of the patient for that delivery and the patient is "incapable of consenting," and because the health care provider runs the risk of civil suit when providing "health care" without consent of the patient. The Act is intended to apply broadly to the customary and routine medical practice. *See* Thompson, *Indiana's New Health Care Consent Act: A Guiding Light for the Health Care Provider*, 21 Ind.L.Rev. 181, 182 (1988). The Act serves its purpose by providing the broadest possible definition of the terms "health care" and "health care providers," and then giving legal recognition to consent by substitutes.

Having declared itself applicable to the entire health care realm, the Act then assures the reader in the last two sections that it is not defining as a matter of Indiana law and public policy the extent of that realm. Specifically, I.C. 16–8–12–11(a), (c), (e)(1), (e)(2), and I.C. 16–8–12–12, provide:

> This chapter does not affect Indiana law concerning an individual's authorization to make a health care decision for the individual or another individual, or to provide, withdraw, or withhold medical care necessary to prolong or sustain life.
>
> . . . .
>
> This chapter does not authorize an individual to consent to any health care that is prohibited under Indiana law.
>
> . . . .
>
> This chapter does not affect Indiana law concerning:
> The standard of care of a health care provider required in the provision of health care;
> When consent is required for health care;
>
> . . . .
>
> Nothing in this chapter may be construed to authorize euthanasia.

These provisions instruct the reader that it is not the purpose of this statute to provide the basis for answering a question of whether a particular proposed "health care" requires consent. The question is valid, but the answer to such questions is to be found elsewhere. "Health care" is not defined in this act for such purposes. The statute is silent on the critical issues in this appeal.

The co-petitioners, parents of Sue Ann Lawrance, in their amended petition asked the Court to sanction consent to a particular form of "health care," namely "the withdrawal of artificially delivered nutrition and hydration for their daughter, Sue Ann Lawrance." The trial court granted that part of the petition saying:

> [T]his Court now Orders and Adjudges that the Co-petitioners herein, William and Bonita Lawrance, do have the authority under I.C. § 16–8–12–1 et seq. to consent, as surrogate decision makers, to the withdrawal of artificially delivered nutrition and hydration from their daughter. . . .

The amended order went on to restrain the State Board of Health and all health care providers from interfering with the execution of this plan. Clearly this order was not made by the probate court pursuant to the authority of I.C. 16–8–12–7, but rests upon the remainder of the Act which cannot possibly support it. The next question is whether the order is supported by other lawful authority.

Recognition of the basic natural rights of each person to life and liberty is the starting point for courts in dealing with cases of this class. Article 1, Section 1, Indiana Constitution. Protection for life and liberty is guaranteed by the constitution. Article 1, Sections 1 and 12, Indiana Constitution. Courts must be vigilant in cases coming before them to protect these basic natural rights. The common law recognizes the right of the individual to refuse medical treatment in appropriate circumstances. *See Payne v. Marion General Hospital* (1990), Ind.App., 549 N.E.2d 1043; *In re Quinlan*, 70 N.J. 10, 355 A.2d 647 (1976); *In re Eichner v. Dillon*, 52 N.Y.2d 363, 420 N.E.2d 64, 438 N.Y.S.2d 266 (1981); *Superintendent of Belchertown State School v. Saikewicz*, 373 Mass. 728, 370 N.E.2d 417

(1977). The Massachusetts Supreme Judicial Court stated:

A person has a strong interest in being free from nonconsensual invasion of his bodily integrity, and a constitutional right of privacy that may be asserted to prevent unwanted infringements of bodily integrity. Thus a competent person has a general right to refuse medical treatment in appropriate circumstances, to be determined by balancing the individual interest against counterveiling State interests, particularly the State interest in the preservation of life. In striking that balance account is to be taken of the prognosis and of the magnitude of the proposed invasion. The same right is also extended to an incompetent person, to be exercised through a 'substituted judgment' on his behalf. The decision should be that which would be made by the incompetent person, if he were competent, taking into account his actual interests and preferences and also his present and future incompetency.

*In re Spring*, 380 Mass 629, 634, 405 N.E.2d 115, 119 (1980) (discussing *Saikewicz*). I take it as axiomatic, requiring no citation of authority, that this right does not include (1) a right to commit suicide, (2) a right to mutilate one's own body, (3) a right to have one's life taken by another, or (4) a right to have one's dying expedited by participation of others.

The amended petition below sought a form of relief which posed a threat to the life of Sue Ann Lawrance. Because of this, the trial court was called upon to exercise a heightened vigilance. At the time of the hearing in the trial court, Sue Ann Lawrance was in her early forties and had been essentially unconscious since 1987. The majority opinion describes her youth:

Ms. Lawrance had been healthy until the age of nine, when she displayed symptoms of intracranial pressure and underwent a craniotomy ... She suffered permanent brain damage and attended special schools and camps for the mentally handicapped.

Majority opinion at 35. She had never been competent to make a personal health care decision. Her physicians were of the opinion that she would not regain consciousness. She had extensive brain damage to the frontal portions of the brain; however, the brain stem was healthy and her EEG showed slow and erratic activity in the frontal regions. She was not brain dead. Thus, she breathed spontaneously and regularly; her heart beat spontaneously and regularly; and her other vital signs were normal. It is profoundly important that she was not terminally ill and was not suffering.

At the time she had an ideal body weight. Her skin condition was good. She had no bed sores. She was receiving some minor medications and had had several seizures lasting a few minutes over a period of months which, in the opinion of the neurologist, were the product of her unconscious, non-responsive existence.

She was being maintained in this totally helpless state by food and liquids provided her through a stomach tube. She was being cared for by providers who loved her and took care of her. She was bathed and kept clean, and often propped up in a wheel chair and taken from her room. They dreaded the thought of withdrawing her care. If this process of feeding had been stopped, she would have eventually died of starvation or dehydration.

The stomach tube had been surgically implanted and in constant use for a long time when the hearing in court took place. The invasion of her body involved in those activities is not directly involved here. Here it is the maintenance of the tube and its continued use to deliver basic food and liquid which is at stake. The maintenance of the tube and its continued use are certainly invasive of the person, but I judge not greatly so. There are no chemicals or medicines involved which alter one's mental or physical processes. The natural processes in the stomach and intestines are utilized. It is a simple, clean process which does not involve a great deal of liquid or the expenditure of a great deal of time by health care providers. A person who persists in life with only such basic support,

without pain and suffering, with the strength to fight off illness and disease, though unconscious and unable to react with other human beings, is not greatly burdened by that support. One cannot help but compare this burden with the crushing ones of hemodialysis, peritoneal dialysis, and certain forms of chemotherapy.

The state's interest against which the patient's interest in self-determination may be balanced has been recently considered to have four manifestations, namely, the interest in preserving life, the interest in preventing suicide, the interest in safeguarding the integrity of the medical profession, and the interest in protecting innocent third parties. *In re Conroy*, 98 N.J. 321, 348–53, 486 A.2d 1209, 1223–25 (1985). In Indiana, 410 IAC 16.2–3–7 contains food and nutrition regulations promulgated pursuant to I.C. 16–10–4–5. The regulations apply to Health Care Facilities and mandate that the basic nutritional needs of all residents be met. Here, on balance, the right of Sue Ann Lawrance to refuse unwanted treatment in the form of artificially delivered food and hydration, exercised for her by her parents without knowledge of a personal choice by Sue Ann Lawrance, gives way to the counterveiling state interest in preserving her life. On the facts in this record, the order approving the withdrawal of her life-sustaining nutrition and hydration does not find legal justification and should be reversed.