


FILED

Jan 09 2025, 9:43 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

## IN THE
# Court of Appeals of Indiana

In the Matter of the Civil Commitment of:
T.G.,

*Appellant-Respondent*

v.

## Community Health Network,

*Appellee-Petitioner*

---

January 9, 2025

Court of Appeals Case No.
24A-MH-1930

Appeal from the Marion Superior Court

The Honorable David J. Certo, Judge
The Honorable Matthew M. Schappa, Judge Pro Tempore

Trial Court Cause No.
49D08-2407-MH-30194

---

**Weissmann, Judge.**

[1] T.G. appeals her temporary involuntary civil commitment, arguing that the trial court erred by qualifying T.G.'s doctor as an expert witness and in finding T.G. mentally ill and gravely disabled. We find no error and affirm.

## Facts

[2] On July 2, 2024, T.G. was transported by ambulance to a Community Health Network (Community) hospital after purportedly suffering a foot injury at work. T.G. claimed a large piece of glass had fallen on her foot, but hospital staff observed no injury. While awaiting a CT scan, T.G. jumped off her gurney and hid inside an empty hospital room. T.G. also claimed she was being "trafficked" by her workplace managers and family members. Tr. Vol. II, p. 20.

[3] T.G.'s comments and behavior led to her psychiatric evaluation and, in turn, emergency detention at the hospital. While detained, T.G. was examined 26 times by Paige Bimberg, M.D., a hospital psychiatry resident. T.G. displayed paranoid delusions during these examinations, including beliefs that gangs inside and outside the hospital were attempting to traffic her and that there was a two-way mirror in her hospital bathroom through which the traffickers were watching her. T.G. also expressed beliefs that doctors were falsifying her

medical records to hide medical conditions such as brain tumors.[1] According to Dr. Bimberg, T.G.'s delusions made conversing with her "very difficult," as her answers to simple questions quickly turned into long tangential discussions about her paranoid beliefs. *Id.* at 38.

[4] T.G. had been living on the street for several months prior to her emergency detention, and due to alleged "safety concerns," T.G. would not disclose to Dr. Bimberg where she might go upon her discharge from the hospital. *Id.* at 22. T.G. claimed she had been "evicted" from her apartment, and she indicated that her trafficking concerns had caused her to be kicked out of homeless shelters in the past. *Id.* at 34. Though she was employed at a Goodwill store at the time of her hospital admission, T.G. expressed that she would not return to that job because her managers were involved in her trafficking.

[5] Dr. Bimberg diagnosed T.G. with "unspecified psychosis" and concluded this "chronic mental illness" rendered T.G. unable to provide herself with essential human needs—primarily shelter. *Id.* at 21. T.G., however, did not believe she was mentally ill and was unwilling to take medications. Therefore, Community petitioned for her temporary involuntary civil commitment.

[6] At a civil commitment hearing held on July 18, 2024, Community presented Dr. Bimberg as an expert witness. Among other things, Dr. Bimberg testified that her psychiatry residency began on July 1, 2024, and that she had worked

---

[1] T.G. underwent a CT scan at the hospital, and it revealed no brain tumor.

sixteen days since then. T.G. objected to Dr. Bimberg's qualification as an expert in psychiatry, emphasizing that her residency began just one day before T.G.'s admission to the hospital. Over this objection, the trial court qualified Dr. Bimberg as an expert and permitted her to testify about T.G.'s diagnosis, symptoms, inability to function, and lack of insight concerning her mental health.

[7] T.G. also testified at the commitment hearing. When asked about her safety concerns outside the hospital, T.G. stated: "I've had people that have befriended me using a romance scam uh, gained my trust and then destroyed property, um, destroyed evidence and injured me personally and I don't know why anybody wouldn't be concerned about a safety like, a safety issue of that sort." *Id.* at 49. T.G. later described her "immediate family members" as "predators" and indicated that they had physically and emotionally hurt her in the past. *Id.* at 52.

[8] On the issue of trafficking, T.G. presented two May 2022 police reports in which she accused her ex-boyfriend of harassing and stalking her. T.G. also testified that, on several occasions, her ex-boyfriend had told her if she loved him, she would "whore [her]self out" to a room full of men. *Id.* at 53. When asked if other people had said similar things to her, T.G. added that, when she was a child, her sibling asked her to "either be naked and lie with him or to give him oral pleasure." *Id.*

T.G. disputed that trafficking concerns were the reason she planned not to return to her job at Goodwill. Instead, T.G. stated: "I believe what I told them repeatedly was that it wasn't a good fit for me because of some of the harassment and bullying that I was dealing with um from other staff members and customers that were just not behaving themselves." *Id.* at 42. T.G. then explained her apartment "eviction" as follows:

> They did not renew the lease and it was after ten months of me reporting to rural development as well as all the way to the civil rights commission that I had been, being harassed from the apartment manager. I requested a replacement manager because I needed to have somebody to give my rent payment to every month um they refused um, ironically none of that is in the system and I just found that out yesterday by you I believe. It was very upsetting, because I had no representation in court, I was never allowed a counter claim, it evicted me illegal (sic) as a retaliation for reporting harassment on government property. Yet I paid my rent every month in full and on time and detail cleaned the apartment top to bottom and steam cleaned the carpets before I left. It was move in ready.

*Id.* at 45.

T.G. also testified that she had saved enough money to stay at a hotel for six to eight months. But when asked if she would be able to secure housing upon her discharge from the hospital, T.G. responded:

> I do believe so sir, I'm just not sure at what, where or of what kind. Um, since I was paying my rent in full and on time and being harassed on government property, it makes it very hard for me to believe that I'm gonna, in the same state where I was

illegally had (sic) a retaliatory eviction and forced to be homeless, that I would be able to sign a lease in another government facility and have smooth sailing if you know what I mean. . . . I will attempt to find all kinds of housing, but I will never go back to a shelter system again.

*Id.* at 49.

[11] Dr. Bimberg ultimately recommended that T.G. be temporarily committed to the hospital so that she could be stabilized on an anti-psychotic medication and set up with outpatient care. The trial court agreed. Finding T.G. was mentally ill and gravely disabled, among other things, the court ordered her civil commitment for a period not to exceed 90 days.

## Discussion and Decision

[12] On appeal, T.G. challenges the admissibility and sufficiency of the evidence supporting her temporary involuntary civil commitment. Though her arguments were mooted by the passage of the 90-day commitment period, T.G. raises the novel issue of whether a doctor may be qualified to testify as an expert in psychiatry only sixteen days into their psychiatry residency. Because the resolution of this question adds to the instructive body of law, we opt to consider the merits of T.G.'s appeal under the public interest exception to the mootness doctrine. In the end, we find sufficient admissible evidence to support the trial court's judgment.

## I. Mootness Exception

Community asks this Court to dismiss T.G.'s appeal as moot because the trial court's 90-day commitment order expired while the appeal was pending. "The long-standing rule in Indiana courts has been that a case is deemed moot when no effective relief can be rendered to the parties before the court." *T.W. v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 121 N.E.3d 1039, 1042 (Ind. 2019) (quoting *Matter of Lawrance*, 579 N.E.2d 32, 37 (Ind. 1991)). Though we generally dismiss moot cases, "Indiana recognizes a public interest exception to the mootness doctrine, which may be invoked when the issue involves a question of great public importance which is likely to recur." *Id.* (quoting *Matter of Tina T.*, 579 N.E.2d 48, 54 (Ind. 1991)).

T.G. claims her appeal involves issues of great public importance and urges us to consider their merits under the public interest exception. "Temporary civil commitments can often fit within this public interest exception to mootness because they are transitory in nature and require the delicate balancing of a person's fundamental liberty interest with the safety of individuals and the public." *E.F. v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 188 N.E.3d 464, 465 (Ind. 2022). "Because of the fundamental interests at stake in these cases, review of the issues presented is important, including the nuances of the sufficiency of the evidence to support a commitment." *Id.* at 467.

Our Supreme Court has explained that "appellate courts are not required to issue an opinion in every moot temporary commitment appeal, but they may

readily do so to address novel issues or close calls, or to build the instructive body of law to help trial courts make these urgent and difficult decisions." *Id.* at 466. Though T.G.'s arguments are moot, we elect to consider their merits under the public interest exception in order to add to the instructive body of law.

## II. Admissibility

[16] T.G. first argues that the trial court erred by allowing Dr. Bimberg to testify as an expert witness. Indiana Evidence Rule 702(a) provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

Any one or a combination of the factors listed in Evidence Rule 702(a) may serve as the basis for a witness qualifying as an expert. *Bennett v. Richmond*, 960 N.E.2d 782, 789 (Ind. 2012). Thus, a witness may testify as an expert if their opinion is based on any "peculiar knowledge or experience not common to the world" that may aid the finder of fact. *Aillones v. Minton*, 77 N.E.3d 196, 199 (Ind. Ct. App. 2017) (internal quotations omitted). On the other hand, a witness who knows no more than the average person may not testify as an expert. *Pinkins v. State*, 799 N.E.2d 1079, 1087-88 (Ind. Ct. App. 2003).

[17] "A trial court's determination regarding the admissibility of expert testimony under Rule 702 is a matter within its broad discretion and will be reversed only for abuse of that discretion." *TRW Vehicle Safety Sys., Inc. v. Moore*, 936 N.E.2d

201, 216 (Ind. 2010). "The trial court's decision is presumed correct, and the party challenging the decision has the burden of persuading us that the trial court abused its discretion." *Id.*

[18] T.G. claims the trial court abused its discretion in qualifying Dr. Bimberg as an expert in psychiatry because she was not a board-certified physician. According to T.G., Dr. Bimberg was merely a psychiatry resident who had begun her residency just one day before T.G.'s admission to the hospital and had only worked sixteen days by the time she testified at T.G.'s commitment hearing.

[19] In support of her claim, T.G. points to this Court's decision in *K.K. v. Cmty. Health Network, Inc.*, 215 N.E.3d 382 (Ind. Ct. App. 2023). There, it was held that the trial court did not abuse discretion in qualifying a hospital psychiatry resident as an expert in psychiatry, in part, because the resident was six months into her residency. *Id.* at 385. But the Court did not establish six months of residency as the minimum standard for qualifying a doctor as an expert in their field, as T.G.'s argument suggests. Indeed, the Court further noted that the doctor had "completed four years of medical school," "held a temporary medical license," "identified psychiatry as the focus of her training," and "had experience treating adults with 'various mental disorders.'" *Id.*

[20] Here, Dr. Bimberg similarly testified that she was a medical school graduate who had focused her training on the field of psychiatry. Thus, she was "familiar with mental illnesses," "how they're diagnosed," and the "symptoms that support those diagnoses." Tr. Vol. II, p. 19. Dr. Bimberg also testified that she

held a temporary license to practice medicine during her psychiatry residency. And though this advanced training had just begun, Dr. Bimberg examined 64 patients between the start of her residency and the day of her testimony.

[21] Given the evidence of Dr. Bimberg's education, training, knowledge, and experience as well as the deference given to trial courts in these circumstances, we cannot say the court erred in qualifying Dr. Bimberg as an expert witness under Evidence 702(a).

## III. Sufficiency of the Evidence

[22] T.G. next argues that Community presented insufficient evidence to support her temporary involuntary civil commitment. To obtain an individual's involuntary civil commitment, a "petitioner is required to prove by clear and convincing evidence that: (1) the individual is mentally ill and either dangerous or gravely disabled; and (2) detention or commitment of that individual is appropriate." Ind. Code § 12-26-2-5(e). Here, as to the first enumerated element, the trial court found that T.G. was mentally ill and gravely disabled. T.G. challenges the sufficiency of the evidence to support each of these findings.

[23] When reviewing the sufficiency of the evidence to support an individual's involuntary civil commitment, we neither reweigh the evidence nor judge the credibility of witnesses. *Civ. Commitment of T.K. v. Dep't of Veterans Affs.*, 27 N.E.3d 271, 273 (Ind. 2015). Instead, we consider the evidence and reasonable inferences most favorable to the judgment, and we will affirm if a reasonable

trier of fact could have found the necessary elements proven by clear and convincing evidence. *Id.*

## A. Mentally Ill

Indiana Code § 12-7-2-130(1) defines "mental illness" to mean "a psychiatric disorder that: (A) substantially disturbs an individual's thinking, feeling, or behavior; and (B) impairs the individual's ability to function."

At the civil commitment hearing, Dr. Bimberg testified that she diagnosed T.G. with "unspecified psychosis," a "chronic mental illness." Tr. Vol. II, p. 21. Among other things, Dr. Bimberg based this diagnosis on T.G.'s display of paranoid delusions that she was being "trafficked" by unspecified gangs, her workplace managers, and family members. *Id.* at 20. Dr. Bimberg also testified that T.G.'s delusions made conversing with her "very difficult" and had caused her to be kicked out of homeless shelters in the past. *Id.* at 38.

T.G. claims that Community failed to prove "T.G.'s so called 'delusions' were a result of mental illness as opposed to a natural fear in response to real life past trauma." Appellant's Br. p. 20. But this is merely an invitation for this court to reweigh the evidence, which is not our role. *See T.K.*, 27 N.E.3d at 273. The record contains clear and convincing evidence that T.G. had a psychiatric disorder that substantially disturbed her thinking and impaired her ability to function. Therefore, sufficient evidence supported the trial court's finding that T.G. was mentally ill.

## B. Gravely Disabled

Indiana Code § 12-7-2-96(1) defines "gravely disabled" to mean "a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual . . . is unable to provide for that individual's food, clothing, shelter, or other essential human needs."

At the civil commitment hearing, Dr. Bimberg testified that T.G. had been living on the street for several months prior to her emergency detention and that her trafficking concerns had caused her to be kicked out of homeless shelters in the past. Tr. Vol. II, p. 33. Due to unspecified "safety concerns," T.G. would not disclose to Dr. Bimberg where she might go upon her discharge from the hospital. *Id.* at 22. And T.G.'s own testimony at the hearing indicated that she did not have a plan.

Emphasizing her Goodwill employment and purported savings, T.G. claims that Community failed to prove hotels were not a viable means of shelter. But this, too, is an impermissible request for us to reweigh the evidence. *See T.K.*, 27 N.E.3d at 273. The record contains clear and convincing evidence that, as a result of her mental illness, T.G. was in danger of coming to harm because she was unable to provide herself with shelter. Therefore, sufficient evidence supported the trial court's finding that T.G. was gravely disabled.

## Conclusion

[30] Finding the trial court's judgment supported by sufficient, admissible evidence, we affirm.

Pyle, J., and Felix, J., concur.

ATTORNEY FOR APPELLANT

Talisha R. Griffin
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Kathryn E. DeWeese
Joshua L. Radicke
Bunger & Robertson
Bloomington, Indiana