In re the COMMITMENT OF J.B.

No. 76A05–0201–CV–38.

Court of Appeals of Indiana.

April 30, 2002.

Claramary Winebrenner, Vanhorne Law Office, Auburn, IN, Attorney for Appellant.

## OPINION

BAKER, Judge.

J.B. appeals his involuntary mental health commitment and the trial court's order allowing hospital staff to administer medications despite his refusal. Though the issues raised are moot, we address J.B.'s contentions because they are a matter of great public importance. In addressing his claims, we hold that there was sufficient evidence to support J.B.'s temporary commitment and that J.B. failed to show that his communications with a deacon of the Church of Jehovah's Witnesses fell under the "priest penitent privilege." We also hold, however, that the petitioner's counsel[1] failed to make the showing required to support medicating J.B. despite his refusal.

## FACTS

Michael Dilts, a deacon in the Church of the Jehovah's Witnesses, filed an application requesting J.B.'s emergency detention. On the application, Dilts noted that J.B. was "bipolar" and "not taking his medicine." Appellant's App. p. 30. Dilts also wrote that J.B. discussed wanting to "kill something" such as a dog, cat, or J.B.'s ex-wife. Appellant's App. p. 30. J.B. wanted to "hit" his ex-wife "with [a] hammer [and] cut her up into little pieces." Appellant's App. p. 30. Dilts believed that if J.B. were not restrained immediately he would harm his ex-wife and children. On September 20, 2001, acting on Dilt's application, the trial court ordered J.B. detained at an in-patient psychiatric unit for seventy-two hours.

Four days later, the in-patient facility filed a report with the court and requested an additional period of commitment. In response, the trial court set a hearing on J.B.'s continued commitment. At that hearing, J.B. did not appear and his counsel asked for a continuance. J.B. would

1. A deputy prosecuting attorney of Steuben County represented Dilts at the hearings. It is perhaps for this reason that J.B. listed the State of Indiana as the appellee. The Attorney General filed a motion to correct the record with this court requesting that we remove the State of Indiana as appellee. The motion claimed that the deputy prosecutor represented Dilts at the trial court's behest and that the State had no immediate interest in defending the appeal. In an order dated March 12, 2002, this court granted the Attorney General's motion.

have appeared in court but for a sudden feeling of faintness immediately before he was to be transported from the in-patient facility to the court. Tr. p. 4. The court continued the hearing for seven days until October 4, 2001.

Before the October 4 hearing, J.B. moved for a change of judge. The trial court held the October 4 hearing, which it labeled a "probable cause" hearing, and afterwards granted J.B.'s motion for a change of a judge. Dr. Francis Cyran, J.B.'s psychiatrist at the in-patient facility, appeared at the October 4 hearing and testified that he had previously treated J.B. for being "potentially dangerous" and had committed him to a state hospital. Tr. p. 13. Dr. Cyran diagnosed J.B. as having bi-polar disorder, a diagnosis confirmed by other doctors who have treated J.B. Dr. Cyran discovered that J.B. had been missing in New York just two months before the seventy-two-hour commitment. While in New York, J.B. was mugged, left his belongings—including his social security card—at a restaurant, and wrote $1,400 in bad checks. It is not clear from the record, but shortly before or after these events, J.B. was hospitalized in New York where he was diagnosed with bi-polar disorder. Dr. Cyran learned from Dilts's application that J.B. had not been taking his medication and learned that J.B. had threatened to harm his ex-wife. Apparently, when Dr. Cyran discussed the threats with him, J.B. explained that he did not say he wanted to hit his ex-wife with a hammer. Instead, J.B. clarified that he had said that he wanted to beat her with a baseball bat. Moreover, Dr. Cyran related that the application was consistent with his conversations with family members who told him that J.B. was not taking his medication.

In addition to Dr. Cyran, Richard Sturtz, an elder of the Church of Jehovah's Witnesses, testified about threats J.B. had made. J.B. had told Sturtz that he wanted to kill his ex-wife with a hammer. Testifying at the hearing, J.B. said that Sturtz had misquoted him. According to J.B., what he had actually said was that he wanted "to take a bat and knock it upside her head." Tr. p. 29. His comment was an expression of his "inner most" feelings and not a threat. Tr. p. 30, 31.

Judge VanDerbeck was appointed as special judge to preside over the final hearing on J.B.'s temporary commitment. J.B. filed a motion to dismiss the petition at the final hearing, claiming that it was held outside the statutory time limits. The trial court denied the motion and conducted the final hearing. Dr. Cyran testified that he was aware that, on or about the date the petition for emergency detention was granted, J.B.'s ex-wife had contacted the police because J.B. had shown up at her house. The police then took J.B. to the hospital for emergency detention. Dr. Cyran testified at the final hearing that he had examined J.B. five days a week since J.B. had been admitted to the in-patient facility. Dr. Cyran also noted that three physicians, in addition himself, had diagnosed J.B. as suffering from bi-polar disorder. When asked what behaviors Dr. Cyran had observed to support his diagnosis, J.B.'s counsel objected. J.B.'s counsel argued that Dr. Cyran's observations were privileged under the doctor patient relationship codified in Indiana Code section 34–46–3–1. However, J.B.'s counsel thought it "would be appropriate" if Dr. Cyran gave only his opinion of J.B.'s mental condition. Tr. p. 46–47. The trial court sustained the objection and allowed Dr. Cyran to give his medical opinion on J.B.'s condition.[2]

2. J.B. concedes on appeal that the trial court erred in sustaining his objection. Appellant's

Dr. Cyran then opined that J.B. was unable to feed, clothe, and provide shelter and other essential needs for himself. Dr. Cyran also concluded that J.B. was a danger to others and gravely disabled. After Dr. Cyran had testified, J.B.'s counsel moved for a directed verdict, arguing that petitioner's counsel had presented no other witnesses and could not rely merely on the doctor's opinion without supporting evidence of J.B.'s bizarre acts or statements. The trial court denied the motion. J.B.'s counsel, as a result, called Sturtz as a witness. Sturtz testified that J.B. had told him he would like to kill his ex-wife. At the hearing's conclusion, the trial court ordered J.B.'s temporary commitment and gave permission to the hospital to administer J.B.'s medications should he refuse them. J.B. now appeals.

## DISCUSSION AND DECISION

### I. The Question of Mootness

◼ J.B. appeals the trial court's commitment order and order permitting the hospital to administer medications despite his refusal. According to an affidavit filed in this court by J.B.'s appellate counsel, J.B. has been released from the in-patient facility. Generally, we consider only those matters contained in the record below. *See Outlaw v. Erbrich Prods. Co.*, 742 N.E.2d 526, 528 n. 1 (Ind.Ct.App.2001). However, we may receive proof outside of the record in order to determine whether an appeal is moot. *Kieselbach v. Feuer*, 183 Ind. 582, 584, 109 N.E. 842, 843 (1915); *Dell v. City of Tipton*, 618 N.E.2d 1338, 1341 n. 1 (Ind.Ct.App.1993).

◼ As noted above, J.B. concedes that he has been released from his involuntary mental health commitment. There-

fore, this court cannot render effective relief to him. When a court is unable to render effective relief to a party, the case is deemed moot and usually dismissed. *In re Lawrance*, 579 N.E.2d 32, 37 (Ind.1991). "Although moot cases are usually dismissed, Indiana courts have long recognized that a case may be decided on its merits under an exception to the general rule when the case involves questions of 'great public interest.'" *Id.* Typically, cases falling in the "great public interest" exception contain issues likely to recur. *Id.; see Ind. High Sch. Athletic Ass'n, Inc. v. Durham*, 748 N.E.2d 404, 412 (Ind.Ct. App.2001) ("Although Indiana does not require that the issue be capable of repetition, cases falling into the public interest exception usually involve issues that are likely to recur.").

◼ The question of how persons subject to involuntary commitment are treated by our trial courts is one of great importance to society. Indiana statutory and case law affirm that the value and dignity of the individual facing commitment or treatment is of great societal concern. *See* Ind.Code § 12–26–5–1 (establishing procedures for seventy-two-hour commitment); Ind.Code § 12–26–6–2 (establishing procedures for ninety-day commitment); *In re Mental Commitment of M.P.*, 510 N.E.2d 645, 646 (Ind.1987) (noting that the statute granting a patient the right to refuse treatment "profoundly affirms the value and dignity of the individual and the commitment of this society to insuring humane treatment of those we confine"). The instant case involves the proof necessary for involuntary commitment and the issue of when doctors may forcibly administer medication to a person who refuses to take

---

App. p. 10. In *G.P.H. v. Giles,* this court held: "The physician-patient privilege which might otherwise exist must yield to permit a full consideration of the patient's mental condi-

tion within the framework of the commitment statute. The communications at issue here were thus admissible evidence." 578 N.E.2d 729, 739 (Ind.Ct.App.1991).

them. These are issues of great public importance and are likely to recur, so we will address them here.

## II. Sufficiency of the Evidence

### A. Involuntary Commitment

■ J.B. contends that, at the final hearing, Dr. Cyran's conclusion alone that he was gravely disabled and a danger to others was insufficient to support temporary commitment. When reviewing a challenge to the sufficiency of the evidence, we look to the evidence most favorable to the trial court's decision and all reasonable inferences drawn therefrom. *In re Commitment of G.M.*, 743 N.E.2d 1148, 1150–51 (Ind.Ct.App.2001). If the trial court's commitment order represents a conclusion that a reasonable person could have drawn, the order must be affirmed, even if other reasonable conclusions are possible. *Id.* at 1151. In an involuntary commitment case, the petitioner must prove by clear and convincing evidence: "(1) the individual is mentally ill and either dangerous or gravely disabled; and (2) detention or commitment of that individual is appropriate." Ind.Code § 12–26–2–5(e).

J.B. premises his argument on the following assertion: "There may be evidence of other places in the record of the events that led to these commitment proceedings, but that evidence was not incorporated into the petitioner's case in the final hearing." Appellant's Br. p. 7. In addressing J.B.'s assertion, we turn to a statutory provision governing "temporary commitment" hearings. Temporary commitments are ones where an individual may be committed for a period not to exceed ninety days. Ind.Code § 12–26–6–10(a). At the hearing on an individual's temporary commitment, the trial court may rely on evidence presented at the hearing as well as the evidence of record. *See* Ind.Code § 12–26–6–8(a); *In re Commitment of* *G.M.*, 743 N.E.2d at 1151 (relying on, among other evidence, the original petition requesting involuntary commitment in upholding the trial court's order). Moreover, at least one physician who has examined the individual must testify at the hearing on the individual's temporary commitment. Ind.Code § 12–26–5–11.

J.B. has mistakenly concluded that evidence adduced in the earlier hearings was not "incorporated in the final hearing." First, the statute governing a temporary commitment hearing allows the trial court to consider matters in the record. I.C. § 12–26–6–8. Second, Judge VanDerbeck indicated his familiarity with the record at the very beginning of the hearing. Judge VanDerbeck noted that the issues related to the earlier hearing were to be "reheard or addressed" at the final hearing. Tr. p. 37. More specifically, in denying J.B.'s motion to dismiss the petition on timeliness grounds, Judge VanDerbeck had—by the time of the final hearing—already researched the issue to arrive at an informed decision. Tr. p. 37–38.

■ Examining the record as a whole, including Dr. Cyran's testimony at the final hearing, we agree with the trial court that the evidence was sufficient to support J.B.'s temporary commitment. The trial court was entitled to consider the entire record regarding J.B.'s emergency detention, including the earlier hearing. First, Dilts's petition indicated that J.B. was threatening to kill his ex-wife. Sturtz, who stated that J.B. told him he wanted to kill his ex-wife, corroborated this threat. Further, at the first hearing, J.B. testified that Sturtz and Dilts had misquoted him. According to J.B., he said that he merely wanted "to take a bat and knock it upside her head." Tr. p. 29. Dr. Cyran testified that J.B.'s ex-wife had told him she feared for her life the day J.B. had shown up at her residence. Tr. p. 16. She was so

fearful she called the police who apprehended J.B. and brought him to the hospital. Tr. p. 16–17. Finally, Dr. Cyran ended his testimony by concluding that inpatient care not to exceed ninety days was the least restrictive environment suitable for treating J.B.

In addition, the evidence adduced at the final hearing supports the temporary commitment. Dr. Cyran had treated J.B. for mental illness previously and was aware of J.B.'s medical history. Dr. Cyran testified that J.B. had been hospitalized in New York just two and a half months prior to the final hearing, where he was diagnosed with bi-polar disorder. Dr. Cyran also testified that he had examined J.B. every day since his latest detention. Moreover, the trial court heard the circumstances of J.B.'s emergency detention-that his ex-wife, out of fear, had called the police because J.B. had been at her home. Finally, Sturtz, testifying for the defense, stated that J.B. admitted to beating his wife. Tr. p. 50. We think this evidence is sufficient to show that J.B. suffers from mental illness and is dangerous. For this reason, we need not examine whether J.B. was gravely disabled.

### B. Forced Medication

J.B. further contends that the trial court erred in allowing the hospital to forcibly medicate him. Our supreme court, in *In re Mental Commitment of M.P.*, set forth requirements for medicating an individual despite the individual's refusal. 510 N.E.2d 645, 647 (Ind.1987). One requirement germane to the instant case is that the trial court "determine that there has been an evaluation of each and every other form of treatment and every alternative form of treatment has been rejected." *Id.* Second, the trial court may not order "the indefinite administration of the medication." *Id.* at 648. In other words, "[t]he

court must curtail the time period within which they may be administered." *Id.*

■ Here, at the hearing's conclusion, petitioner's counsel requested the court's permission to administer medications should J.B. refuse them. Tr. p. 57. First, the trial court did not consider what medications the hospital wanted to administer. Second, the trial court did not evaluate each alternative. Third, the trial court did not impose a definite time limit on the administration of the medication. We must conclude, therefore, that the trial court erred in ordering the hospital to administer medications against J.B.'s refusal. We note, however, that if the hospital staff administered medications to J.B. despite his refusal, they would have done so in accord with the trial court's order, which was then valid.

### III. Priest–Penitent Privilege

■ J.B.'s final contention of error rests on the priest-penitent privilege. He claims that expressing his feelings about his ex-wife to Dilts, a deacon of the Church of Jehovah's Witnesses, triggered the priest-penitent privilege. Under Indiana statute, clergymen are not competent witnesses under the following circumstances:

(3) Clergymen, as to the following confessions, admissions, or confidential communications:

(A) Confessions or admissions made to a clergyman in the course of discipline enjoined by the clergyman's church.

(B) A confidential communication made to a clergyman in the clergyman's professional character as a spiritual adviser or counselor.

Ind.Code § 34–46–3–1. Because this privilege is derived from a statute, it must be strictly construed. *Mullins v. State*, 721

N.E.2d 335, 338 (Ind.Ct.App.1999), *trans. denied.*

■ On appeal, J.B. claims that he had counseled with Dilts in a "priest/penitent capacity." Appellant's App. p. 15. However, J.B. presented no evidence of Dilts's particular role within the Church of Jehovah's Witnesses, or the role of a "deacon" generally within the Church of Jehovah's Witnesses. Moreover, J.B. has neglected to set forth any evidence explaining the nature or circumstances of his communication with Dilts, other than his conclusion that it fell under the priest penitent privilege. Hence, J.B.'s unsupported argument cannot prevail, especially in light of our duty to construe the privilege narrowly.

## CONCLUSION

In sum, there was sufficient evidence to support J.B.'s involuntary commitment. The trial court was free to consider the original petition, the record of the previous hearing, and the testimony admitted at the final hearing. Furthermore, J.B. failed to show that his communication with Dilts was privileged communication. However, we conclude that the order allowing for J.B.'s forced medication was made in error. The trial court failed to ascertain the medications the hospital sought to use, failed to determine whether there were any alternative treatments, and failed to impose a definite time limit on the medications that were to be administered even if J.B. refused.

Affirmed in part and reversed in part.

SULLIVAN and DARDEN, JJ., concur.