## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 04 2017, 8:20 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Darren Bedwell
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Phyllis J. Garrison
Eskenazi Health
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Civil Commitment of C.B., <br> *Appellant-Respondent,* <br><br> v. <br><br> Eskenazi Health Midtown Community Mental Health, <br> *Appellee-Petitioner* | May 4, 2017 <br><br> Court of Appeals Case No. 49A04-1606-MH-1256 <br><br> Appeal from the Marion Superior Court, Probate Division <br><br> The Honorable Steven R. Eichholtz, Judge <br><br> Trial Court Cause No. 49D08-1605-MH-17646 |

**Mathias, Judge.**

[1] C.B. appeals the Marion Superior Court's order involuntarily committing him to the Health & Hospital Corporation of Marion County d/b/a Eskenazi Health Midtown Community Mental Health ("Eskenazi Health") for a period

not expected to exceed ninety days. Concluding that the temporary commitment order is supported by clear and convincing evidence, we affirm.

## Facts and Procedural History

[2] C.B. is a 72-year-old retired science teacher. On an unknown date in mid-May 2016, C.B. was found in an alleyway and told a police officer that he was "working on a government program to import Russian women." Tr. p. 9. He was taken to Methodist Hospital in Indianapolis but was not detained.

[3] On May 16, 2016, C.B. called 911 to report that an FBI agent had been killed. Police officers found no evidence that C.B.'s report was accurate. C.B. was admitted to Eskenazi Health's Crisis Intervention Unit that night but was released. The next day, May 17, 2016, a police officer took C.B. to Eskenazi Health, and he was admitted because he was "very delusional." Tr. p. 8.

[4] On May 18, 2016, Eskenazi Health filed an application for emergency detention. Shortly thereafter, it filed a report and physician's statement alleging that C.B. suffered from an "unspecified psychotic disorder" and that he was gravely disabled. Appellant's App. pp. 12-16. The trial court held a hearing on Eskenazi's application on May 26, 2016.

[5] Dr. Thomas Beesley, a psychiatry resident, testified that C.B. reported that he was a member of the FBI and he needed to be released from the hospital to go to orientation. C.B. also told the doctor that he was "an elite member of the Republican Party" and the party was working "diligently" to get C.B. out of the hospital. Tr. p. 9. C.B. told numerous individuals that he was the President-

elect of the United States. C.B. also stated to numerous Eskenazi Health employees that he was recommending them for cabinet positions. Tr. p. 10.

[6] After reviewing C.B.'s medical records and examining him, Dr. Beesley concluded that C.B. suffers from a psychotic disorder. Dr. Beesley also believed that C.B. was homeless because C.B. gave the doctor several different explanations for his lack of housing and his living situation if he were discharged from the hospital. *Id.* Dr. Beesley opined that C.B. is gravely disabled because he does not understand his mental illness, cannot function independently, and will not follow up on his treatment plan.

[7] Dr. Beesley prescribed Risperdal, but also discovered that C.B. has a vitamin B12 deficiency that is likely triggering his psychosis. Tr. p. 12. In addition, "B12 deficiency can cause more severe symptoms. Mainly neurologic symptoms which can progress theoretically to the point of death." Tr. p. 14. Dr. Beesley started C.B. on "IM B12 replacement" injections, and C.B. was willing to take those. Tr. p. 15. Dr. Beesley stated that C.B. would need the injections for up to fourteen days. Treatment on an out-patient basis was possible but "the discharge plans that C.B. [] proposed ha[d] all been delusional based." Tr. p. 16.

[8] Dr. Beesley did not believe that C.B. would voluntarily continue his treatment plan.

> I believe his inability to cooperate and to have medical decision making capacity is all directly related to his psychosis and his delusional beliefs. And with that being said, even with the B12

replacement, it's clear there are other medical conditions going on and he's not allowing us to work those medical conditions up. And it is possible that the psychosis won't improve with the B12 injections because it's being caused by another medical condition.

Tr. pp. 16-17. The doctor also expressed the need for C.B. "to have housing and [a] stable environment where we could . . . have him actually come back for clinic appointments. And get subsequent B12 injections." Tr. p. 18.

[9] C.B. did not agree with Dr. Beesley's diagnosis and wanted a second opinion from a doctor at St. Vincent's Hospital. C.B. believed that Dr. Beesley was a poor doctor who needed money, who "is trying to achieve more status so he can do . . . more intrusions into my body that are not necessary." Tr. p. 38.

[10] C.B.'s testimony at the commitment hearing also established that on May 17, 2016, the date he was admitted to Eskenazi, he did not have stable housing. Tr. pp. 34-35 (explaining that the day he was detained he was trying to find a safe place to stay for the night). C.B. still suffered from delusions at the hearing and continued to believe that the FBI had a certificate, badge, gun, and holster waiting for him but he had not had training yet. Tr. pp. 36-37. C.B. could not recall placing a 911 call claiming that an FBI agent had been shot. C.B. also testified that the Republican Party was going to employ him and give him a gun, badge, and holster. Tr. p. 53. He testified that the Republican Party was preparing him to run for president in four years. Tr. p. 56. Finally, C.B. said he receives a social security check each month and stated that if he was released

from the hospital he could stay with a friend who lives in Kokomo or possibly near his brother in Crown Point.

[11] After the hearing and argument by the parties, the trial court issued an order of temporary commitment of C.B. The court concluded that C.B. was gravely disabled as defined in Indiana Code section 12-7-2-96. Appellant's App. p. 8. C.B. was committed until August 24, 2016 "unless discharged prior." *Id.* C.B. appeals the order of temporary commitment.

## Discussion and Decision

[12] C.B.'s appeal of his involuntary commitment is moot because he was committed to Eskenazi Health until August 24, 2016 "unless discharged prior" to that date. Appellant's App. p. 8. In general, "[w]hen a court is unable to render effective relief to a party, the case is deemed moot and usually dismissed." *In re J.B.*, 766 N.E.2d 795, 798 (Ind. Ct. App. 2002) (citing *In re Lawrance*, 579 N.E.2d 32, 37 (Ind. 1991)). However, our courts "have long recognized that a case may be decided on its merits under an exception to the general rule when the case involves questions of 'great public interest.'" *In re Lawrance*, 579 N.E.2d at 37. Typically, cases falling in the "great public interest" exception contain issues likely to recur. *Id.*; *see Ind. High Sch. Athletic Ass'n, Inc. v. Durham*, 748 N.E.2d 404, 412 (Ind. Ct. App. 2001) ("Although Indiana does not require that the issue be capable of repetition, cases falling into the public interest exception usually involve issues that are likely to recur.").

[13] Involuntary commitment of otherwise free individuals in the United States is an issue of great importance to society. In other countries, mental health commitments are misused, often for political purposes. Indiana statutory and case law affirm that the value and dignity of the individual facing commitment or treatment is of great societal concern. *See* Ind. Code § 12-26-5-1 (establishing procedures for seventy-two-hour commitment); Ind. Code § 12-26-6-2 (establishing procedures for ninety-day commitment); *In re Mental Commitment of M.P.*, 510 N.E.2d 645, 646 (Ind. 1987) (noting that the statute granting a patient the right to refuse treatment "profoundly affirms the value and dignity of the individual and the commitment of this society to insuring humane treatment of those we confine"). Because the instant case involves the proof necessary for involuntary commitment, an issue of great public importance which will recur, we address it here. *See In re J.B.*, 766 N.E.2d at 798-99.

[14] C.B. claims that the trial court's order allowing for his involuntary commitment is not supported by clear and convincing evidence. In *Civil Commitment of T.K. v. Dep't of Veterans Affairs*, 27 N.E.3d 271 (Ind. 2015), our supreme court explained, "[t]o obtain an involuntary regular commitment of an individual, a 'petitioner is required to prove by clear and convincing evidence that: (1) the individual is mentally ill and either dangerous or gravely disabled; and (2) detention or commitment of that individual is appropriate." *Id.* at 273 (quoting Ind. Code § 12-26-2-5(e)) (footnote omitted).

> [T]he purpose of civil commitment proceedings is dual: to protect the public and to ensure the rights of the person whose liberty is

at stake. The liberty interest at stake in a civil commitment proceeding goes beyond a loss of one's physical freedom, and given the serious stigma and adverse social consequences that accompany such physical confinement, a proceeding for an involuntary civil commitment is subject to due process requirements. To satisfy the requirements of due process, the facts justifying an involuntary commitment must be shown "by clear and convincing evidence . . . [which] not only communicates the relative importance our legal system attaches to a decision ordering an involuntary commitment, but . . . also has the function of reducing the chance of inappropriate commitments."

*Id.* (internal citations omitted).

C.B. concedes that he is mentally ill but argues that Eskenazi Health did not present clear and convincing evidence that he was gravely disabled.[1] "Gravely disabled" is defined as:

> a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:
>
> > (1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or
> >
> > (2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

---

[1] The trial court did not find that C.B. was dangerous to himself or others, only that he was gravely disabled. Appellant's App. p. 8.

Ind. Code § 12-7-2-96. "[D]enial of illness and refusal to medicate, standing alone, are insufficient to establish grave disability because they do not establish, by clear and convincing evidence, that such behavior 'results in the individual's inability to function independently.'" *T.K.*, 27 N.E.3d at 276 (quoting I.C. § 12-7-2-96).

[16] C.B. was not malnourished and did not exhibit poor hygiene when he was admitted to Eskenazi Health on May 17, 2016. In addition, he has monthly social security income sufficient to support himself. However, Dr. Beesley believed that C.B. was homeless because C.B. made several different statements concerning his lack of housing and his living situation if he were discharged from the hospital. C.B.'s testimony at the hearing also established that on May 17, 2016, he did not have stable housing. Tr. pp. 34-35.

[17] Dr. Beesley believes that C.B. needs "housing and [a] stable environment where we could . . . have him actually come back for clinic appointments. And get subsequent B12 injections." Tr. p. 18. At the hearing, the doctor expressed concern that C.B. does not understand his mental illness, cannot function independently, and would not follow up with his treatment plan. During the week prior to his May 17, 2016 admission to Eskenazi Health, C.B. was twice taken to hospitals by police officers. On May 17, the third time C.B. was transported to a hospital in approximately one week, he was delusional and lacked housing. At the time he presented, C.B. clearly satisfied both definitions of grave disability under the statue, when only one is required for commitment.

To us, it is clear that C.B. needed a structured environment for a moderate period of time to stabilize his medical and psychiatric conditions and to allow doctors to properly assess his course of treatment going forward. Judge Eichholtz's order was creatively and appropriately limited to solve the problem before him.

[18] For these reasons, we conclude that clear and convincing evidence supports the trial court's finding that C.B. was gravely disabled as defined by Indiana Code section 12-7-2-96. We therefore affirm the trial court's order of temporary commitment.

[19] Affirmed.

Baker, J., and Pyle, J., concur.