

**FILED**

Sep 14 2023, 8:41 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Megan Shipley
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Andrew B. Howk
John D. French
Hall, Render, Killian, Heath &
Lyman
Indianapolis

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Civil
Commitment of:

C.P.,

*Appellant-Respondent,*

v.

St. Vincent Hospital and Health
Care Center, Inc. d.b.a. St.
Vincent Stress Center,

*Appellee-Petitioner*

September 14, 2023

Court of Appeals Case No.
22A-MH-2960

Appeal from the Marion Superior
Court

The Honorable Steven R.
Eichholtz, Judge

The Honorable Marc J. Lloyd,
Senior Judge

Trial Court Cause No.
49D08-2211-MH-38929

**Opinion by Judge Mathias**
Judges Vaidik and Pyle concur.

**Mathias, Judge.**

In 2019, our Supreme Court held that a consolidated appeal of two temporary-commitment orders was moot where the terms of those commitments had expired before the appeal of those orders was ripe for appellate review. *In re Commitment of T.W.*, 121 N.E.3d 1039, 1042 (Ind. 2019). However, because the parties before the Court had not developed a record on possible "harmful collateral consequences" from the commitment orders aside from the terms of those commitments, the Court "left open the possibility that respondents in [temporary-commitment appeals] could seek relief" from allegedly invalid orders due to any such consequences. *Id.* at 1044 n.5; *E.F. v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 188 N.E.3d 464, 466 (Ind. 2022) (per curiam).

Today, on a properly presented record, we reach the question left open by our Supreme Court. On these facts, we hold that the collateral consequences that accompany C.P.'s order of involuntary civil commitment make his appeal from that order not moot even though the term of his commitment has expired. Because meaningful effects of C.P.'s commitment will remain long after his appeal period has passed, and because there is still meaningful relief that can be had from our review of his commitment, his appeal is properly before us on its merits. On the merits, we conclude that the St. Vincent Stress Center presented sufficient evidence to support the trial court's order that C.P. be involuntarily committed for not more than ninety days. We therefore affirm the trial court's judgment.

## Facts and Procedural History

[3] In 2022, C.P. was twenty-one years old and owned his own construction business. He had also owned a handgun since he was eighteen, and he and his father would go to the gun range and shoot together. Around late September or early October 2022, C.P. seemed to be "doing fine," according to his father. Tr. Vol. 2, p. 10.

[4] However, over the ensuing four to six weeks, C.P.'s father "noticed a major shift" in C.P.'s "approach to things," and C.P. suddenly seemed "very delusional." *Id.* C.P. would say that "God [wa]s speaking to him," and he would call various people, including doctors, "the devil." *Id.* at 11. C.P. began spending money "left and right until . . . he basically" did not have "much left." *Id.* at 11. He made "unusually large purchases," including "a shotgun, a rifle, . . . two handguns, . . . two knives," and "about $10,000 worth of tools." *Id.* at 11-12. He also purchased a "holster that he mounted inside of his boot," and he started carrying one knife on the side of his belt and the other on the back of his belt. *Id.* at 12. C.P. stated that he was "going to buy a bow and arrow set . . . to be silent when he shoots . . . so no one can hear it." *Id.* at 13. C.P.'s actions along with his "delusional talking" left C.P.'s father "scared" for and "concerned about" C.P. *Id.* at 12.

[5] Sometime after making those purchases, C.P. had an "out-of-body experience" where "God . . . told him to go to Florida to help the residents" there following a hurricane. *Id.* at 23, 30. C.P. then drove a truck with a trailer, his tools, and

one of his firearms to Sarasota. But then C.P. "left his truck" and the other items in Sarasota and, sometime later, "ended up in Orlando." *Id.* at 14. He called his parents from a hotel, and they flew to Orlando and met him at the hotel. C.P. was "trying to come back" to Indiana, but he was unable to use his credit cards and could not pay for a hotel room or an Uber driver who had brought him to the hotel. *Id.* at 17-18. C.P.'s parents "help[ed] him out" with those costs and then flew him back to Indiana. *Id.* at 18.

[6] In early November, C.P. drove to his old high school several days in a row during the high school's basketball practices. According to C.P., he went to the practices to "teach these kids because I am financially free." *Id.* at 36. On the third or fourth day in a row, he took a firearm and ammunition with him, which he placed in the front seat of his car.

[7] That evening, C.P., with the assistance of his former high school basketball coach, checked himself into the St. Vincent Stress Center in Indianapolis. There, he was examined by Dr. Carl Ratliff. Dr. Ratliff observed that C.P. had "rapid, illogical statements and thoughts" and exhibited "grandiose delusions" and "religious preoccupations." *Id.* at 22-23. Dr. Ratliff also observed that C.P. exhibited a "fluctuating mood, from irritability[ and] aggressive behavior[] to pleasant and cooperative at very rapid shifts [that we]re difficult to predict, and[,] at times, difficult . . . to manage." *Id.* at 23.

[8] As an example of C.P.'s rapid and illogical statements, Dr. Ratliff later recounted C.P. stating that he

want[ed] to leave the unit to return to Florida to be with his various employees, pick[] up his car at the DMV or he's going to go to jail, visit[] his grandparents at their grave[s], as well as statements indicating that he has chlamydia, he needs to leave the unit to get treated, and[,] finally, he needs to leave the unit because he cannot drink the water on our unit because he can taste the salt.

*Id.* at 22. Dr. Ratliff emphasized that it was the manner in which C.P. made those statements, not the substance of the statements themselves, that was indicative of mental illness. Specifically, Dr. Ratliff clarified that C.P.'s statements were all made "in one sentence," which indicated "pressured speech" and "rapid, illogical thoughts . . . ." *Id.* at 23-24.

[9] Regarding C.P.'s "grandiose delusions," Dr. Ratliff recounted C.P. stating that "he owns at least five businesses, that he sold approximately $70,000 of stock at a $40,000 loss to help the residents of Florida, and that he plans on being a millionaire, if not[] trillionaire." *Id.* at 22-23. Dr. Ratliff also noted that C.P.'s "religious preoccupations" include believing that God is talking directly to him, "that no one is able to hold the [B]ible except himself, and that he is able to identify devil worshippers," which included Dr. Ratliff and a case manager. *Id.* at 23.

[10] Dr. Ratliff diagnosed C.P. with bipolar I disorder, most recent episode manic, which is a mood disorder where the patient fluctuates between depressive episodes and episodes of mania. Dr. Ratliff concluded that C.P.'s treatment plan would be a medicinal regimen. However, C.P. refused to take his

prescription medication and stated that he did not need it. Dr. Ratliff concluded that C.P. does not have any insight into his condition and that, if left untreated, C.P. would likely relapse into mania or depression.

[11] The Stress Center then filed a petition for C.P.'s involuntary temporary commitment. The trial court held a fact-finding hearing on the Stress Center's petition, and Dr. Ratliff and C.P.'s father both testified in favor of C.P.'s involuntary temporary commitment. During his testimony, Dr. Ratliff stated that C.P.'s clinical symptoms were such that C.P. "will have a difficult time functioning" independently as an outpatient, that Dr. Ratliff had "concerns about [C.P.'s] . . . safety" because C.P.'s symptoms "will predispose him to poor decision-making," and that C.P.'s access to firearms was "very concern[ing]" and, "potentially," made C.P. "a danger to himself." *Id.* at 26.

[12] Similarly, C.P.'s father testified that he was concerned about C.P.'s ability to function independently, noting that C.P. is "not working right now," "hasn't worked in the last few weeks," "ran out of gas twice," and has "depleted the money he's had." *Id.* at 18. C.P.'s father also noted that C.P. will not listen to his parents and "gets really angry at us." *Id.* C.P. testified against the Stress Center's petition at the hearing, insisting that he was not suffering from a mental illness but, rather, "life." *Id.* at 32.

[13] Following the fact-finding hearing, the trial court found that C.P. is both a danger to himself and also is gravely disabled. The court then granted the Stress Center's petition for C.P.'s involuntary temporary commitment. C.P. now

appeals that order. On February 14, 2023, six days before C.P.'s initial brief in our Court was due, his ninety-day term of commitment expired.

## 1. Where, as here, commitment orders carry consequences beyond the terms of the commitments and appellate review can provide meaningful relief from those collateral consequences, appeals from expired involuntary civil commitment orders are not moot, and they are properly before us on their merits.

Indiana law provides that a trial court may order a mentally ill person who is dangerous or gravely disabled to be committed to a facility for either a temporary period of not more than ninety days or for a regular period of more than ninety days. Ind. Code §§ 12-26-6-1, 7-1 (2023). In 2002, a panel of this Court *sua sponte* declared that an appeal from a temporary-commitment order was moot because the ninety-day term of the commitment had expired by the time the appeal was ripe for our review, and, thus, we were unable to provide the respondent the relief of his release from that term of commitment. *In re Commitment of J.B.*, 766 N.E.2d 795, 798-99 (Ind. Ct. App. 2002).

Although the "long-standing rule in Indiana courts has been" that a moot appeal "will be dismissed," instead of dismissing the *J.B.* panel applied a narrow exception for matters of "great public interest" to reach the merits of its appeal based on the respondent's liberty interests in not being unlawfully committed. *In re Lawrance*, 579 N.E.2d 32, 37 (Ind. 1991); *J.B.*, 766 N.E.2d at 798-99. In the several years that followed the panel opinion in *J.B.*, our Court

"routinely considered the merits" of temporary-commitment appeals by following the same analytical approach as the panel in *J.B.*, namely, by declaring the appeals moot but nonetheless reaching their merits under the purportedly narrow great-public-interest exception. *E.F.*, 188 N.E.3d at 467; *see, e.g.*, *In re Commitment of J.M.*, 62 N.E.3d 1208, 1210-11 (Ind. Ct. App 2016).

[16]    In 2019, our Supreme Court, for the first time, declared an appeal from two temporary-commitment orders moot because "[t]he period [of the commitments] . . . ha[d] passed." *T.W.*, 121 N.E.3d at 1042. A few years later, our Supreme Court clarified that its opinion in *T.W.* was not intended to "disapprove of [the] practice" of applying the great-public-interest exception to reach the merits of temporary-commitment appeals. *E.F.*, 188 N.E.3d at 467. But the Court added that we are "not required to issue an opinion in every moot case," that we "should avoid issuing advisory opinions," and that each temporary-commitment appeal should be considered "on a case-by-case basis." *Id.* at 465, 467. Following *E.F.*, various panels of our Court have continued to dismiss some temporary-commitment appeals while other panels have continued to decide some of these appeals on their merits. *See, e.g.*, *In re Commitment of K.K.*, ___ N.E.3d ___, 2023 WL 4875197, at *2 (Ind. Ct. App. Aug. 1, 2023) (deciding the appeal on its merits); *In re Commitment of J.G.*, 209 N.E.3d 1206, 1210-11 (Ind. Ct. App. 2023) (dismissing the appeal as moot).

[17]    However, our Supreme Court's opinions in this area have made it a point to leave open the possibility of an alternative analytical framework in which to reach the merits of expired involuntary civil commitment orders on appeal. In

particular, because the parties before our Supreme Court had not developed a record on possible "harmful collateral consequences" from those commitment orders aside from the terms of those commitments, our Supreme Court "left open the possibility that respondents in [temporary-commitment appeals] could seek relief" from allegedly invalid orders due to any such consequences. *E.F.*, 188 N.E.3d at 466; *T.W.*, 121 N.E.3d at 1044 n.5. Here, C.P. properly raises for our review the question left open by our Supreme Court. And, on this record, we agree with C.P. that the collateral consequences that accompany his involuntary civil commitment order make his appeal from that order not moot even though the term of his commitment has expired.

[18] As we have long recognized:

> An appeal or an issue becomes moot when:
>
>> 1. it is no longer "live" or when the parties lack a legally cognizable interest in the outcome;
>>
>> 2. the principal questions in issue have ceased to be matters of real controversy between the parties; or
>>
>> 3. *the court on appeal is unable to render effective relief upon an issue*.
>
> *Haggerty v. Bloomington Board of Public Safety* (1985), Ind. App., 474 N.E.2d 114, 115-116. Because this court decides only real controversies or questions, we dismiss appeals which raise moot or abstract propositions. *Perkins v. Kocher* (1988), Ind. App., 531 N.E.2d 231, 233. However, *the appeal before us is not moot. An*

*appeal may be heard . . . where leaving the judgment undisturbed might lead to negative collateral consequences.* *In Re Marriage of Stariha* (1987), Ind. App., 509 N.E.2d 1117, 1123. The reasoning behind this exception is that "it is far better to eliminate the source of a potential legal disability than to require the citizen to suffer the possibly unjustified consequence of the disability itself for an indefinite period of time." *Id.*; citing *Sibron v. New York* (1968), 392 U.S. 40, 88 S. Ct. 1889, 20 L. Ed. 2d 917.

*Roark v. Roark*, 551 N.E.2d 865, 867-68 (Ind. Ct. App. 1990) (emphases added).

[19] Indiana's appellate courts have applied the "collateral consequences" doctrine to hold that appeals are not moot where meaningful relief may still be had by our review of those appeals on their merits. For example, in *In re S.D.*, our Supreme Court considered the validity of a Child in Need of Services ("CHINS") adjudication. 2 N.E.3d 1283 (Ind. 2014). However, while the appeal was pending, the child was returned to her mother's care, and the CHINS case was closed. Accordingly, the Indiana Department of Child Services ("DCS") moved to dismiss the appeal as moot.

[20] Our Supreme Court held that the appeal was not moot based on the following "long-lasting collateral consequences" that accompany CHINS adjudications:

> a CHINS finding can relax the State's burden for terminating parental rights. Under Indiana Code section 31-35-2-4(b)(2)(B)(iii) (Supp. 2013), the State may terminate parental rights if a child has been adjudicated [a] CHINS on two prior occasions, without proving either that the conditions resulting in a child's removal will not be remedied or that continuing the parent-child relationship threatens the child's well-being. And a prior CHINS finding may have adverse job consequences as well,

such as precluding Mother from employment with any DCS contractor. *See generally* Ind. Dept. of Child Servs., Ind. Child Welfare Policy Manual § 13.4 (2013), available at http://www.in.gov/dcs/files/13.4_Evaluation_of_Background_ Checks_ for_DCS_Contractors.pdf. Similarly, a CHINS finding may preclude her from become a licensed foster parent. *Id.* at § 13.10, available at http://www.in. gov/dcs/files/13_10_Evaluating_Background_Checks_for_Foste r_Family_Licensing. pdf. *Reversal cannot change the efforts Mother expended in complying with the CHINS case, but it still affords her meaningful relief by lifting those collateral burdens*. We therefore decline to find the case moot.

*Id.* at 1285, 1290 (emphasis added).[1]

[21]     Our appellate courts have likewise repeatedly invoked the collateral-consequences doctrine to review the merits of appeals where the order at issue, if invalid and left undisturbed, could contribute to a future adverse finding against the appellant. *See, e.g.*, *Smith v. State*, 971 N.E.2d 86, 89 (Ind. 2012) (reviewing the merits of the trial court's finding that the defendant had violated the conditions of his placement in community corrections due to possible "negative collateral consequences" from such a finding, even though the defendant had "served his sentence"); *Hamed v. State*, 852 N.E.2d 619, 622-23

---

[1] Our Supreme Court's analysis in *S.D.* was based on collateral consequences that attach to *any* CHINS adjudication; the analysis was not based on a showing of specific facts that the mother in *S.D.* was facing a termination petition, that she sought employment with a DCS contractor, or that she sought to become a licensed foster parent. *Id.* at 1285-86, 1290. No matter how compelling a comparison of CHINS and mental-health consequences may be, we limit our holding to these specific facts and need not reach the question of whether the same showing C.P. makes would suffice to enable appellate review of the merits of every involuntary civil commitment order.

(Ind. Ct. App. 2006) (reviewing the merits of an expired no contact order because, if a violation of the order were later alleged, it could contribute to a contempt proceeding or a criminal charge); *Kirby v. State*, 822 N.E.2d 1097, 1101 n.4 (Ind. Ct. App. 2005) (reviewing the merits of a post-conviction petition, even though the sentence for the underlying conviction had been served, because "convictions have collateral consequences inasmuch as they . . . may form the basis of a habitual offender enhancement"), *trans. denied*; *McBain v. Hamilton Cnty.*, 744 N.E.2d 984, 987-88 (Ind. Ct. App. 2001) (reviewing the merits of a tax sale, even though the original owners had redeemed their property, based in part on "negative collateral consequences that would be unjustified if the sale w[ere] invalid . . . ."); *Roark*, 551 N.E.2d at 867-68 (reviewing the merits of a CHINS adjudication, despite the matter being closed, "because of the potentially devastating consequences" of the adjudication); *In re Marriage of Stariha*, 509 N.E.2d 1117, 1123 (Ind. Ct. App. 1987) (holding that a father's appeal of his contempt conviction for failure to pay child support was not moot, even though his sentence had been served, because of "possible collateral consequences"); *see also S.D.*, 2 N.E.3d at 1290 (holding that a closed CHINS case is not moot in part because a CHINS adjudication can result in "relax[ing] the State's burden for terminating parental rights").

[22] We agree with C.P. that the order for his involuntary civil commitment carries significant negative collateral consequences from which appellate review may afford him meaningful relief. In particular, federal law prohibits a person who

has been committed to a mental institution from knowingly possessing a firearm, the violation of which may result in a fifteen-year sentence. 18 U.S.C. §§ 922(g)(4), 924(a)(8) (2022). Likewise, Indiana law generally prohibits a person who has been involuntarily committed from knowingly or intentionally carrying a handgun, the violation of which can be a Class A misdemeanor or a Level 5 felony. I.C. § 35-47-2-1.5(a)(3)(B), (b)(7)(C), (e) (2022). Here, the record is clear that C.P. has long exercised his right to possess a handgun, having owned at least one since he was eighteen and having spent time shooting it at gun ranges with his father. Thus, the collateral consequence of C.P.'s loss of his right to lawfully possess a handgun makes his appeal worthy of appellate review.[2]

[23] For all of these reasons, we reach the question that our Supreme Court left open in *T.W.* and *E.F.*, we decline to follow the *sua sponte* analysis of *J.B.* here, and we hold that C.P.'s appeal from his expired involuntary civil commitment order is not moot but, rather, is properly before us on its merits based on the negative collateral consequences that accompany that order. We therefore turn to the merits of this appeal.

---

[2] C.P. also argues that a history of commitments itself is a collateral consequence that enables appellate review, noting that Indiana Code section 12-26-3-9 expressly restricts the type of commitment a trial court may order based on the respondent's history of commitments and that our Court has likewise recognized that a "history of mental illness requiring hospitalizations" may be probative of whether a person is "gravely disabled and should be involuntarily committed." *Golub v. Giles*, 814 N.E.2d 1034, 1039 (Ind. Ct. App. 2004), *trans. Denied*. However compelling this argument may be, since we hold that C.P.'s loss of his right to lawfully possess a handgun is sufficient to enable appellate review of his commitment, we need not consider this additional possible basis for reviewing the merits of his commitment.

## 2. The Stress Center presented sufficient evidence to support C.P.'s temporary commitment.

We thus turn to C.P.'s argument on appeal that the Stress Center failed to present sufficient evidence to support his temporary commitment. In our review of such issues, we consider "only that evidence most favorable to the judgment, along with" the reasonable inferences therefrom. *In re Commitment of T.K.*, 27 N.E.3d 271, 274 (Ind. 2015) (cleaned up). We will not reweigh the evidence or reassess witness credibility on appeal. *Id.* at 273. It is the petitioner's burden in the trial court to support the petition for an involuntary civil commitment by clear and convincing evidence. *Id.*

To support its petition for C.P.'s involuntary temporary commitment, the Stress Center was required to show that C.P. was (1) mentally ill; (2) *either* dangerous *or* gravely disabled; and (3) that his commitment was appropriate. I.C. § 12-26-2-5(e) (2022) (emphasis added). On appeal, C.P. challenges only whether the Stress Center's evidence was sufficient to show that he was either dangerous or gravely disabled. As the Stress Center's burden on that element was disjunctive, we need only consider whether the Stress Center's evidence was sufficient to show that C.P. was gravely disabled.

The Stress Center presented sufficient evidence to show that C.P. was gravely disabled. According to Indiana Code section 12-7-2-96 (2022), "gravely disabled," as relevant here, "means a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual . . . has a substantial impairment . . . of that individual's judgment,

reasoning, or behavior that results in the individual's inability to function independently."

[27] The Stress Center presented sufficient evidence to satisfy that definition. C.P. suffered a rapid deterioration of his sense of reality, going from "fine" to "very delusional" in a matter of four to six weeks. Tr. Vol. 2, p. 10. C.P. believed that God was talking to him and that his caregivers were the devil or devil worshipers. He began experiencing very rapid mood swings, from irritable and aggressive to pleasant and cooperative, which sudden shifts were difficult for skilled caregivers to predict and manage.

[28] He began spending unusually large amounts of money to the point that he had none left. He purchased multiple weapons and began carrying them around, including to a local high school and across state lines. Believing he was following God's directions, he drove himself to Sarasota, Florida, with a truck, tools, and a firearm, only to end up in Orlando without his personal property and without access to money. C.P.'s parents ended up flying to Orlando, covered C.P.'s expenses, and then flew him back to Indiana.

[29] At the time of the fact-finding hearing on the Stress Center's petition, C.P. was not working and appeared to be unable to provide for basic needs such as gas for his car. He had started becoming unusually angry at his parents. He refused to acknowledge his mental illness and refused to take prescribed medication. Ultimately, Dr. Ratliff opined that C.P.'s mental illness was such that C.P. "will have a difficult time functioning" independently as an outpatient, and Dr.

Ratliff had "concerns about [C.P.'s] . . . safety" because C.P.'s symptoms "will predispose him to poor decision-making." *Id.* at 26. We hold that a reasonable fact-finder could conclude from those facts that C.P. was gravely disabled.

[30] Still, C.P. asserts that the Stress Center's evidence was insufficient to show that he was "in danger of coming to harm," as required under Indiana Code section 12-7-2-96. But we cannot agree. The Stress Center's evidence readily supported the trial court's conclusion, and C.P.'s argument to the contrary is merely a request for this Court to reweigh the evidence, which we will not do. We affirm the trial court's judgment.

## Conclusion

[31] In sum, we hold that C.P.'s appeal of his temporary-commitment order is not moot, even though the term of his commitment has expired, based on the collateral consequences that accompany his order of involuntary civil commitment. On the merits of this appeal, we hold that the Stress Center presented sufficient evidence to support the trial court's order that C.P. be committed for not more than ninety days. Accordingly, we affirm the trial court's judgment.

[32] Affirmed.

Vaidik, J., and Pyle, J., concur.