

**FILED**

Oct 27 2016, 9:14 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Robert J. Hardy
Hardy Law Office
Auburn, Indiana

ATTORNEY FOR APPELLEE

Eugene C. Bosworth
Angola, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Commitment of J.M., | October 27, 2016 |
| | Court of Appeals Case No. 76A05-1509-MH-1477 |
| J.M., | |
| *Appellant-Respondent,* | Appeal from the Steuben Superior Court |
| v. | The Honorable William C. Fee, Judge |
| Northeastern Center, Inc., | Trial Court Cause No. 76D01-1508-MH-88 |
| *Appellee-Petitioner.* | |

**Najam, Judge.**

## Statement of the Case

J.M. appeals her involuntary mental health commitment. Though the issue raised on appeal is moot, we address J.M.'s argument because it is a matter of great public importance. On the merits of her argument, we hold that there was sufficient evidence to support her temporary commitment. As such, we affirm.

# Facts and Procedural History

[2] On August 10, 2015, Northeastern Center, Inc. ("Northeastern") filed a petition for the involuntary commitment of J.M. due to mental health concerns. The court held a fact-finding hearing on August 13 and August 20.[1] At that hearing, Dr. Lynnea T. Carder testified as follows:

> [J.M.] was admitted [to Northeastern] on August 5th. The admission was prompted by family who called the Angola Police Department. They were saying she was delusional, hallucinations, thinks she was an alien, thought family was against her. She had allegedly made threats to the family. The family was fearful of her. . . . [S]he wasn't recognizing her daughter anymore . . . .
>
> * * *
>
> We have her diagnosed [with] schizoaffective disorder. . . .
>
> * * *
>
> Since admission, we've observed her getting very religiously preoccupied, . . . explosive. We've actually had to restrain her and seclude her at various times throughout her time here. She's somewhat paranoid. She doesn't trust me. She doesn't trust my

---

[1] The parties mistakenly refer to the August 13 and August 20 hearings, and orders that followed each hearing, as independent events. They were not. At the start of the hearing on August 20, the trial court plainly informed the parties that the August 20 hearing was an extension of the earlier hearing held on August 13, Tr. at 18, and the order that followed the August 20 hearing was an amended version of the order that the court had issued after the August 13 hearing. Accordingly, this appeal is an appeal from the August 20 order, and the entirety of the evidence before the court on both dates is available for our review.

qualifications to treat her.  Difficult to engage and difficult to have her follow rules and comply with treatment . . . .

* * *

In April of this year, . . . a family member called our hotline voicing concern because she had been living without heat and electricity and wasn't caring for herself.  And I think shortly thereafter[] they had her move in with family.  And now she is, essentially, disowning her family—wanting nothing to do with them because she believes they are manipulating and are the ones that took her here.   . . . [S]he has no other means of support— nowhere to go.  So she actually was in danger and not having shelter and caring for herself.

* * *

 . . . I was really hopeful that she would comply with medication. And I could stabilize her and transition her home, or to a group home, or an out-patient setting.  But . . . she has refused to comply with any medication.  We have had to give her injections every single day . . . , which has not been fully effective to stabilize her and is somewhat medically dangerous to continue to give her shots every day.  So I am just really concerned about her stability.  If we cannot get oral medicines in her, she will just have to stay in a hospital long term until we can stabilize her with injections . . . .

* * *

 . . . One of the admission issues with family said that she was threatening them and felt very fearful of her.  Prior to the initiation of medications here, she was quite belligerent and agitated, threatening to staff, and as I mentioned, we did have to

restrain and seclude her on various occasions because of her behavior. Since we've been giving her some injections daily, that has subsided somewhat. She's not making threats to harm herself and she's not been (indiscernible) of violence and again that's because she's been getting the daily injections.

Tr. at 19-25.

[3] Following the conclusion of the fact-finding hearing, the trial court found that J.M. suffered from a mental illness, was dangerous, and was gravely disabled. Accordingly, the court ordered J.M. to be committed for a period not to exceed ninety days at Northeastern or another appropriate facility. This appeal ensued.

## Discussion and Decision

[4] J.M. appeals her involuntary commitment at Northeastern. However, we first acknowledge Northeastern's response that, as J.M.'s ninety-day commitment has expired, her appeal is moot. Northeastern is correct. "When a court is unable to render effective relief to a party, the case is deemed moot and usually dismissed." *In re J.B.*, 766 N.E.2d 795, 798 (Ind. Ct. App. 2002) (citing *In re Lawrance*, 579 N.E.2d 32, 37 (Ind. 1991)).

[5] However:

> "Although moot cases are usually dismissed, Indiana courts have long recognized that a case may be decided on its merits under an exception to the general rule when the case involves questions of 'great public interest.'" [*In re Lawrance*, 579 N.E.2d at 37.] Typically, cases falling in the "great public interest" exception contain issues likely to recur. *Id.*; s*ee Ind. High Sch. Athletic Ass'n, Inc. v. Durham*, 748 N.E.2d 404, 412 (Ind. Ct. App. 2001)

("Although Indiana does not require that the issue be capable of repetition, cases falling into the public interest exception usually involve issues that are likely to recur.").

The question of how persons subject to involuntary commitment are treated by our trial courts is one of great importance to society. Indiana statutory and case law affirm that the value and dignity of the individual facing commitment or treatment is of great societal concern. *See* Ind. Code § 12-26-5-1 (establishing procedures for seventy-two-hour commitment); Ind. Code § 12-26-6-2 (establishing procedures for ninety-day commitment); *In re Mental Commitment of M.P.*, 510 N.E.2d 645, 646 (Ind. 1987) (noting that the statute granting a patient the right to refuse treatment "profoundly affirms the value and dignity of the individual and the commitment of this society to insuring humane treatment of those we confine"). The instant case involves the proof necessary for involuntary commitment . . . . Th[is is an issue] of great public importance and [is] likely to recur, so we will address [it] here.

*Id.* at 798-99.

[6]     On the merits of her appeal, J.M. asserts that Northeastern failed to present sufficient evidence to support her involuntary commitment. As we have explained:

When reviewing a challenge to the sufficiency of the evidence, we look to the evidence most favorable to the trial court's decision and all reasonable inferences drawn therefrom. *In re Commitment of G.M.*, 743 N.E.2d 1148, 1150-51 (Ind. Ct. App. 2001). If the trial court's commitment order represents a conclusion that a reasonable person could have drawn, the order must be affirmed, even if other reasonable conclusions are possible. *Id.* at 1151. In an involuntary commitment case, the

petitioner must prove by clear and convincing evidence: "(1) the individual is mentally ill and either dangerous or gravely disabled; and (2) detention or commitment of that individual is appropriate." Ind. Code § 12-26-2-5(e).

*Id.* at 799.

[7] J.M. asserts that Northeastern failed to demonstrate that she is dangerous under Indiana Code Section 12-26-2-5(e)(1). "Dangerous" as used in that statute "means a condition in which an individual as a result of a mental illness[] presents a substantial risk that the individual will harm the individual or others." I.C. § 12-7-2-53. J.M. contends that the evidence on this issue is insufficient because

> [a]t no point did any witness describe the actions that led up to J.M. being placed in restraints or why that option was selected by the staff at the Northeastern Center. . . . There was no discussion of any actions of violence or threats of violence or any other actions that might result in harm to J.M. or others.

Appellant's Br. at 9.

[8] We cannot agree with J.M.'s assessment of the record. A reasonable fact-finder could conclude from Dr. Carder's testimony that J.M., as a result of her mental illness, presented a substantial risk of harm to herself or others. Dr. Carder testified, without objection, that J.M.'s family had described J.M. as delusional and hallucinatory; that J.M. had made threats against them; that they were fearful of J.M.; and that J.M. did not recognize her own daughter. Dr. Carder further testified that, since J.M.'s admission at Northeastern, J.M. had been

"religiously preoccupied, . . . explosive"; "paranoid"; and not trusting of her care providers or their qualifications. Tr. at 21. Dr. Carder informed the court that J.M. had been "belligerent" and "threatening to staff" such that she had to be "restrain[ed]" and "seclude[d]" on "various occasions." *Id.* at 25. And Dr. Carder testified that J.M. had no clear shelter or ability to care for herself, and that J.M. had not been willing to take necessary medications. Based on the evidence before it, a reasonable fact-finder could have concluded that J.M. presented a substantial risk to herself or others. Accordingly, we affirm the trial court's order of involuntary commitment.[2]

[9] Affirmed.

Vaidik, C.J., and Baker, J., concur.

---

[2] As we conclude that the trial court's finding that J.M. was dangerous is supported by substantial evidence, we need not consider J.M.'s additional argument on appeal challenging the court's finding that she was also gravely disabled. *See* I.C. § 12-26-2-5(e)(1).