

FILED

Dec 20 2019, 5:27 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Megan Shipley
Marion County Public Defender's
Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Jenny R. Buchheit
Stephen E. Reynolds
Sean T. Dewey
Ice Miller LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Civil
Commitment of B.N.;

B.N.,

*Appellant-Respondent,*

v.

Community Health Network,
Inc.,

*Appellee-Petitioner.*

December 20, 2019

Court of Appeals Case No.
19A-MH-1037

Appeal from the Marion Superior
Court

The Honorable Kelly Scanlan,
Judge Pro Tempore

Trial Court Cause No.
49D08-1904-MH-13007

**Pyle, Judge.**

# Statement of the Case

B.N. ("B.N.") appeals the trial court's order for his involuntary temporary commitment[1] to Community Health Network, Inc. ("the Hospital") for a period not to exceed ninety days. B.N. argues that the trial court violated his due process right of having the Hospital meet its burden of proving the elements of the involuntary commitment by clear and convincing evidence. Specifically, he contends that the trial court violated this due process right when it ordered him to an involuntary temporary commitment based in part on his own testimony given during the commitment hearing. He also argues that the Hospital did not prove by clear and convincing evidence that the commitment was appropriate. Concluding that there was no due process violation and that B.N.'s sufficiency argument is nothing more than a request to reweigh the evidence, we affirm the trial court's involuntary temporary commitment order.

We affirm.

---

[1] In *Civil Commitment of T.K. v. Dep't of Veterans Affairs,* 27 N.E.3d 271, 273 n. 1 (Ind. 2015), the Indiana Supreme Court explained:

> In Indiana, an adult person may be civilly committed either voluntarily or involuntarily. Involuntary civil commitment may occur under four circumstances if certain statutorily regulated conditions are satisfied: (1) "Immediate Detention" by law enforcement for up to 24 hours; (2) "Emergency Detention" for up to 72 hours; (3) "Temporary Commitment" for up to 90 days; and (4) "Regular Commitment" for an indefinite period of time that may exceed 90 days.

(internal citations omitted).

# Issue

Whether the trial court's order for an involuntary commitment complied with B.N.'s due process right and is supported by sufficient evidence.

# Facts

On March 28, 2019, sixty-two-year-old B.N. was admitted to the Hospital through its crisis department and was examined by psychiatrist Dr. Syed Hasan ("Dr. Hasan"). Thereafter, Dr. Hasan, on behalf of the Hospital, filed an application for the emergency detention of B.N. The Hospital alleged that B.N. was suffering from a psychiatric disorder and was both gravely disabled and dangerous to himself and others. The application indicated that B.N. had been "agitated, delusional, paranoid, not sleeping, report[ing] God is speaking to him[,]" had been "refusing medication" and had "poor insight and poor judgment[.]" (App. Vol. 2 at 10, 11). The application also indicated that B.N. had suicidal ideation.

A few days later, Dr. Hasan filed a Report Following Emergency Detention, requesting the trial court to order B.N. to be involuntary committed to the Hospital on a temporary basis. Dr. Hasan indicated that B.N. was suffering from a delusional disorder and schizophrenia and that he was dangerous and gravely disabled. More specifically, Dr. Hasan reported that B.N. had poor insight, did not believe that he had a mental illness, and had been refusing treatment.

[5] On April 9, 2019, the trial court held a commitment hearing. In support of its involuntary temporary commitment request, the Hospital presented testimony from Dr. Hasan; B.N. stipulated that the doctor was an expert in psychiatry. Dr. Hasan testified that he had examined B.N. four times during his hospital admission, including on the day of the hearing, and he had diagnosed B.N. with delusional disorder and schizoaffective disorder, bipolar type. The doctor also testified that B.N. had a history of mental illness and that he had had a prior hospitalization in Ohio and had received treatment at Gallahue. Dr. Hasan testified that, at the time of B.N.'s emergency admission, B.N. "had been increasingly paranoid and [had been] exhibiting erratic and dangerous behavior." (Tr. Vol. 2 at 6). Additionally, B.N. had not been sleeping or eating and had not been receiving treatment. However, B.N. did report to Dr. Hasan that he had been in the process of getting established at the VA hospital for psychiatric treatment.

[6] Dr. Hasan testified that B.N. did not have insight into his illness when he was not taking medication and that, based on B.N.'s history, there was a risk that B.N. was dangerous to others. According to Dr. Hasan, B.N. had been "very religiously preoccupied[,]" believing that God was speaking to him, "thinking that he [wa]s doing the work of God – missionary work[,]" and "need[ing] to get churches." (Tr. Vol. 2 at 7). On one occasion, which was at the time of "the New Zealand shooting incident in the mosque[,]" B.N. had "parked a car in front of [a] church so people could not come out of the front door[,]" and the police were called to the scene. (Tr. Vol. 2 at 8). According to Dr. Hasan, B.N.

had had "several instances where he ha[d] been involved with the police department filing complaints[,] and [he] then believe[d] that there [wa]s a conspiracy going on against him." (Tr. Vol. 2 at 7). Dr. Hasan testified that, in addition to B.N.'s "encounters with the police department" and the "incident at the church[,]" he was also concerned about B.N.'s "hyper focus on people in higher positions abusing power and then acting in a way that c[ould] be dangerous." (Tr. Vol. 2 at 11). In 2015, B.N. had complained about the mayor and the abuse of power, and he sent the mayor emails that were "perceived maybe as an indirect threat." (Tr. Vol. 2 at 11). Dr. Hasan further testified that, during B.N.'s hospitalization, he had been "very paranoid with the staff members[,]" thinking that they had "a conspiracy against him[.]" (Tr. Vol. 2 at 9). Additionally, B.N. had not followed directions from the staff and had become "extremely agitated" to the point where he had hit a nurse. (Tr. Vol. 2 at 9).

[7] Dr. Hasan also testified that B.N. was gravely disabled and had an "impaired ability to function independently." (Tr. Vol. 2 at 9). The doctor explained that B.N. had been "disorganized and erratic and dangerous" when he was first admitted and that he had been unable to work because he had been "doing work for God[.]" (Tr. Vol. 2 at 9). Dr. Hasan testified that when B.N. became paranoid and delusional, his ability to follow directions and to trust people became compromised.

[8] Dr. Hasan further testified that his treatment plan for B.N. included continued in-patient treatment, two injections of an anti-psychotic medication, and then a

transition to outpatient services within one week. The doctor also testified that B.N. had initially indicated that he would refuse to take any medications without a court order but that he then had begun to take the medication, which had yielded "some improvement[.]" (Tr. Vol. 2 at 12). Dr. Hasan explained that an involuntary temporary commitment was recommended to improve B.N.'s condition and to stabilize his medication before moving him to outpatient treatment. According to Dr. Hasan, the prescribed medications and treatment plan would help to treat B.N.'s mental illness. He also testified that, with treatment, B.N.'s prognosis was "fair" and that, without treatment, his prognosis was "poor." (Tr. Vol. 2 at 13). Additionally, Dr. Hasan testified that he had talked to B.N. about the Hospital's petition seeking the temporary commitment and that B.N. "was in agreement for this temporary commitment and even the injection[.]" (Tr. Vol. 2 at 11).

[9] Following Dr. Hasan's testimony, B.N. testified and corroborated Dr. Hasan's testimony that he had agreed that he would follow the doctor's recommendations for further commitment and medication. B.N.'s counsel questioned B.N. as follows:

> [B.N.'s Counsel:] Okay. And you know why we are here today, correct?
>
> [B.N.:] Yes, ma'am.
>
> [B.N.'s Counsel:] Okay. And the doctor testified that you guys spoke this morning and you wished to stay on your commitment. Is that true?

[B.N.:] I am willing to comply with what the doctor recommends.

[B.N.'s Counsel:] Okay. And has anyone forced you to say that or is this on your own?

[B.N.:] I have wanted counseling prior to this and I have got an appointment scheduled with the VA Hospital next Monday. My only concern is the forced medication of the anti-psychotic medicine. I have had bad experiences with these in the past. But I am willing to comply with the doctor at this time – with the required medication.

[B.N.'s Counsel:] Okay, do you understand your diagnosis?

[B.N.:] Actually, I have a little disagreement regarding paranoia. From what I am understanding, paranoia is an unreasonable fear and I fear only displeasing God.

[B.N.'s Counsel:] Is there anything else you would like the court to know?

[B.N.:] Yes, ma'am.

[B.N.'s Counsel:] Okay.

[B.N.:] I get social security disability of about nine hundred and fifty dollars a month. Which with my pledge of poverty as a Quaker father, this gives me all the funds and supplies all the needs that I have at this time. Regarding the assault – regarding a woman being kicked – I did not intentionally do that. If I did, I have not seen any evidence regarding a bruise on her foot. It is not my intention to hurt or harm anybody at any time. So if she was hurt by me, it was totally by accident and I apologize. I would like to also explain my initial refusal of medications. I have had bad luck with anti-psychotics in the past so I was willing to take all the medications except for the anti-psychotic up until Saturday. Once I realized that I was able to handle the medications without any adverse reactions, I agreed to go ahead

and take the anti-psychotic last Saturday. So I have been complying with the required medications ever since. My phone is a lifeline phone and it is free to me. But incoming calls – I do not answer. They go directly to voicemail. Text is the best way to contact me and I will call you back on my phone. That is how I have been handling it.

(Tr. Vol. 2 at 15-16).

After B.N. had finished testifying, the trial court posed the following question to B.N.:

> Alright. [B.N.], can I just clarify for purposes of the record? What the hospital is requesting is that the court place you on a temporary commitment which means that you would be under court order to take whatever medications Dr. Hasan prescribes as well as to attend your clinic sessions and follow up with your treat[ment] – are you – just so that I am clear – are you in agreement with that at this point in time?

(Tr. Vol. 2 at 16). B.N. responded, "I have no objection to that, your honor." (Tr. Vol. 2 at 16). The trial court then asked the parties' attorneys whether they would "waive argument in that case[,]" and both attorneys agreed. (Tr. Vol. 2 at 16).

Thereafter, the trial court granted the hospital's petition for an involuntary temporary commitment and stated:

> Thank you. Alright. So based on the evidence and [B.N.'s] testimony, the court does find by clear and convincing evidence that he suffers from mental illness, specifically Schizoaffective Disorder Bipolar Type. The court further finds that [B.N.] is gravely disabled in that he is demonstrating an obvious

deterioration in his judgement, reasoning and behavior that has resulted in his inability to function independently at this point in time. And the court bas[e]s that on the doctor's testimony regarding his behavior on the unit and the doctor's assessment that he would be unable to sustain a job at this point in time due to his disorganized thoughts, erratic behavior, lack of insight and religious preoccupation. The court further finds that [B.N.] is a danger to others and that is based on the testimony concerning assault on a nurse both from the doctor and from [B.N.]. Although, the court recognizes that [B.N.] indicates that was an accident. Based on all of the testimony including [B.N.'s] lack of objection to the court, grants the order of temporary commitment. . . .

(Tr. Vol. 2 at 16-17). The trial court's written temporary commitment order indicated that the commitment was based "[u]pon evidence presented" and that the trial court had found "by clear and convincing evidence" that B.N. was suffering from a mental illness (delusional disorder and schizoaffective disorder, bipolar type) and that he was both dangerous to others and gravely disabled. The trial court also found that B.N. was in need of the custody, care, and treatment at the Hospital for a period not to exceed ninety days (up until July 8, 2019 unless discharged prior to that date). B.N. now appeals.

# Decision

[12] B.N. challenges the trial court's order for his involuntary temporary commitment to the Hospital for a period not to exceed ninety days. We initially note, however, that the trial court ordered B.N. to be committed up to July 8, 2019 unless discharged earlier. Because B.N. has already been discharged from the Hospital, this matter is moot. *See In re Commitment of J.M.*,

62 N.E.3d 1208, 1211 (Ind. Ct. App. 2016). "When a court is unable to render effective relief to a party, the case is deemed moot and usually dismissed." *Id.* (internal quotation marks and citations omitted). We, however, may decide such cases where they involve questions of great public interest that are likely to recur. *Id.* The question of how persons subject to involuntary commitment are treated by our trial courts is one of great importance to society. *Id.* We will therefore address B.N.'s argument.

[13] To obtain an involuntary commitment, a petitioner is "required to prove by clear and convincing evidence that: (1) the individual is mentally ill and either dangerous or gravely disabled; and (2) detention or commitment of that individual is appropriate." IND. CODE § 12-26-2-5(e) (format altered). Thus, here, the Hospital had the burden of proving subsections (1) and (2) by clear and convincing evidence.

[14] B.N. does not dispute the sufficiency of evidence supporting the elements that he is mentally ill and either dangerous or gravely disabled under INDIANA CODE § 12-26-2-5(e)(1). Instead, he ultimately challenges the evidence supporting INDIANA CODE § 12-26-2-5(e)(2), arguing that the Hospital did not prove by clear and convincing evidence that the commitment was appropriate.

[15] B.N.'s main appellate challenge, however, is a due process argument, in which he contends that the trial court violated his due process right of having the Hospital meet its burden of proving the involuntary commitment elements by clear and convincing evidence. Specifically, he maintains that the trial court

violated this due process right when it ordered him to an involuntary temporary commitment based in part on his own testimony given during the commitment hearing. He asserts that the trial court's consideration of his testimony, in which he corroborated Dr. Hasan's testimony that he had agreed to follow the doctor's recommendations, reduced the Hospital's burden of proving the involuntary commitment elements and resulted in a violation of his due process right.

[16] The purpose of civil commitment proceedings is to protect the public and to ensure the rights of the person whose liberty is at stake. *Civil Commitment of T.K. v. Dep't of Veterans Affairs*, 27 N.E.3d 271, 273 (Ind. 2015). Given the liberty interest at stake, the serious stigma involved, and the adverse social consequences that accompany such physical confinement, a proceeding for an involuntary civil commitment is subject to due process requirements. *Id.* In order to protect the due process rights of a person subject to commitment, the facts justifying an involuntary commitment must be shown by clear and convincing evidence. *Id.* This standard of proof "communicates the relative importance our legal system attaches to a decision ordering an involuntary commitment," and it has the function of reducing the likelihood of inappropriate commitments. *Id.* (internal quotation marks and citation omitted). When we review the sufficiency of the evidence supporting an involuntary civil commitment, we will affirm if, after considering the probative evidence and reasonable inferences supporting the decision, a reasonable trier of fact could have found the necessary elements proven by clear and convincing

evidence. *Id.* We do not reweigh the evidence, nor do we judge witness credibility. *Id.*

[17] Here, during the commitment hearing, the Hospital set forth to meet its burden of proving the involuntary commitment elements through the testimony of Dr. Hasan, whom B.N. stipulated was an expert in psychiatry. Dr. Hasan gave detailed testimony regarding: (1) what had precipitated B.N.'s emergency commitment; (2) B.N.'s mental illness diagnosis; (3) how B.N. posed a danger to others, including his past actions at the church and the injury caused to a nurse during his emergency commitment; (4) how B.N.'s judgment had been impaired by his disorganized thoughts, erratic behavior, lack of insight, and religious preoccupation; (5) the doctor's proposed treatment plan, which included two injections of an anti-psychotic medication, some other medications, and a transition to outpatient services within one week; (6) how B.N. had initially refused to take medication without a court order but then had recently taken some medication that had yielded some improvement; (7) B.N.'s prognosis with and without further treatment; and (8) the need for B.N.'s temporary commitment at the Hospital in order to improve B.N.'s condition and to stabilize his medication before moving him to outpatient treatment. At the end of his testimony, Dr. Hasan indicated that he had talked to B.N. about the temporary commitment petition and treatment plan and that B.N. "was in agreement for this temporary commitment and even the injection[.]" (Tr. Vol. 2 at 11). Thereafter, B.N. testified and corroborated Dr. Hasan's testimony that he had agreed that he would follow the doctor's recommendations for further

commitment and medication. The trial court then questioned B.N. to clarify his testimony, and B.N. confirmed that he had "no objection[.]" (Tr. Vol. 2 at 16). The trial court then, "based on the evidence and [B.N.'s] testimony," found "by clear and convincing evidence" that B.N. should be ordered to a temporary commitment. (Tr. Vol. 2 at 16-17).

[18] We reject B.N.'s argument that the trial court's consideration of his testimony and question about his agreement with Dr. Hasan's recommendations essentially equated to a reduction of the Hospital's burden of proving the temporary commitment elements by clear and convincing evidence. B.N.'s argument seems to suggest that the trial court was not allowed to consider his testimony when determining whether there was clear and clear and convincing evidence to support the temporary commitment order. However, B.N.'s testimony, along with the testimony of Dr. Hasan, was evidence. Moreover, our review of the record on appeal reveals that there was no such burden reduction. Indeed, the trial court specified, both at the commitment hearing and in its commitment order, that it had found that the elements of the temporary commitment were supported by clear and convincing evidence. There is no evidence that the trial court either explicitly or implicitly held the Hospital to a lesser burden of proof. As a result, the trial court did not violate B.N.'s due process right.[2]

---

[2] We also reject B.N.'s convoluted argument that the trial court's consideration of and reliance upon his testimony resulted in the trial court conflating the involuntary and voluntary commitment statutes and

[19] Lastly, we address B.N.'s sufficiency challenge to the evidence supporting the involuntary commitment element, under INDIANA CODE § 12-26-2-5(e)(2), that the commitment was appropriate. B.N. raised the challenge to this element under a harmless error analysis to his due process argument. Because there was no due process violation, we will not review his argument under harmless error. Instead, we will treat it as a sufficiency argument.

[20] B.N. contends that the Hospital presented "minimal evidence" of the element that the commitment was appropriate and that his own testimony, which he suggests should not have been considered by the trial court, was the "primary evidence" of the element. (B.N.'s Br. 19, 20). We disagree.

[21] As discussed above, Dr. Hasan testified about B.N.'s mental illness diagnosis, how B.N. posed a danger to others, and how B.N.'s judgment had been impaired by his disorganized thoughts, erratic behavior, lack of insight, and religious preoccupation. The doctor also discussed B.N.'s proposed treatment plan, which included two injections of an anti-psychotic medication and a transition to outpatient services within one week. Dr. Hasan further testified about B.N.'s prognosis with and without further treatment and the need for B.N.'s temporary commitment at the Hospital in order to improve B.N.'s condition and to stabilize his medication before moving him to outpatient

---

turning this involuntary commitment proceeding into a voluntary one. Our review of the record reveals that this was an involuntary commitment proceeding in which B.N. chose to testify and corroborated Dr. Hasan's testimony that he was willing to follow the doctor's treatment and medication recommendations.

treatment. B.N.'s argument is nothing more than a request to reweigh the evidence, which we will not do. *T.K.*, 27 N.E.3d 273. We affirm the trial court's involuntary temporary commitment order.

[22] Robb, J., and Mathias, J., concur.